**CHENERY .CORPORATION et al. v. SE-
CURITIES AND EXCHANGE
COMMISSION.**

**FEDERAL WATER & GAS CORPORATION
v. SAME.**

Nos. 8977, 8978.

United States Court of Appeals
District of Columbia.

Argued Nov. 20, 1945.

Decided Fob. 4, 1946.

Writ of Certiorari Granted May 13, 1946.

See 66 S.Ct. 1025.

Mr. Spencer Gordon, of Washington, D. C., with whom Mrs. Virginia Collins Duncombe, of Washington, D. C., was on the brief, for petitioners Chenery Corp. and others.

Mr. Allen S. Hubbard, of New York City, for petitioner Federal Water & Gas Corp.

Mr. Roger S. Foster, Solicitor, Securities and Exchange Commission, of Philadelphia, Pa., for respondent.

Before GRONER, Chief Justice, and CLARK and WILBUR K. MILLER, Associate Justices.

## GRONER, C. J.

This is a petition for the review of an order of the Securities and Exchange Commission, issued February 7, 1945, under the Public Utility Holding Company Act, 15 U.S.C.A. § 79 et seq. The same case was here in 1942.

A brief statement of proceedings on the first appeal may be helpful in understanding the question now presented for decision.

In 1937 Federal Water Service Corporation, hereafter called "Federal," a Delaware holding company, owning securities of subsidiaries operating water, gas, electric and other properties, filed a plan of voluntary reorganization with the Commission under §§ 7 and 11 of the Holding Company Act of 1935.[1] The plan contemplated simplification of the corporate structure and the elimination of existing capital deficits by a reduction of capital which would permit Federal to resume payment of dividends. Subsequently, two additional plans were filed, but were ultimately withdrawn largely on objection by the Commission's staff.

In March, 1940, Federal, as the result of a then recent Delaware Supreme Court decision, filed a new plan of merger, which, with modifications, was approved by the Commission. The new plan, as modified, contained no provision for participation by Class B stock of Federal—which the Commission had found to be without value. Instead, that stock was to be surrendered for cancellation and only Class A common and all issues of preferred were to be converted into common stock of the new corporation.

Petitioners, who were officers and directors of Federal, held a one-third interest in Utility Operators Company, and that company in turn had virtual control of Federal through the ownership of Federal Class B common stock, representing forty-three per cent of voting power. During the period the various plans of reorganization were before the Commission, petitioners purchased Federal's preferred stock to the total amount of 12,467 shares. The purchases were made in the open market, at current prices, from time to time over the three and a half year period during which the negotiations with the Commission's staff were in progress. All of the purchases were made individually, and, except as to Chenery and van den Berg, averaged around 130 shares per individual. Chenery, for the account of a family corporation controlled by him, acquired approximately 8,000 shares, 2,700 shares of which he obtained for $100,000 of Federal's gold bonds in an exchange arrangement with a banking syndicate; and van den Berg, who at the time of final action by the Commission had ceased to be a director of the corporation, purchased in the open market approximately 1,700 shares. If the stock so acquired had been converted into common stock of the new corporation, under the plan as finally approved by the Commission, petitioners stood to receive 79,077 shares of new common, having a par and probable market value (as determined by the Commission) of $5 per share, or an aggregate value of $395,385, in return for the preferred stock which cost petitioners $323,347, a difference of little more than the amount of interest lost in holding the preferred shares pending completion of the plan. The common stock which petitioners (including Chenery Corporation and van den Berg) would thus have received, if their preferred stock had participated in the new corporation, would have represented 7.4% of the total voting power in the new corporation. In addition, petitioners, individually, had acquired 6,500 preferred shares of Federal prior to the filing of any plan of reorganization which when converted would have represented 2.7% of the total voting power. Added together, petitioners stood to hold

---

[1] 15 U.S.C.A. §§ 79g, 79k.

10.1% of the voting power of the reorganized corporation.

The Commission on March 24, 1941, made formal findings on the basis of which it concluded that the plan could not be approved insofar as it provided participation of the preferred shares purchased by petitioners during the period reorganization plans were before the Commission, even though the purchases were made honestly, after full disclosure and at a fair price at public sale. The Commission based its conclusion on its holding that during the pendency of proceedings before the Commission, officers and directors of the corporation occupied a fiduciary relationship to the corporation and to its shareholders, and consequently were subject to the limitations imposed upon fiduciaries in dealing with trust property. Accordingly, on July 1, 1941, an amendment to the plan was submitted by Federal, over petitioners' protest, whereby the stock so purchased would not be converted into common stock of the new corporation, but would be surrendered to the corporation at cost plus 4% interest.

The plan as amended was approved September 24, 1941.

On petition to us to review, we reversed and remanded for further proceedings in conformity with our opinion. Chenery Corp. v. Securities and Exchange Commission, 75 U.S.App.D.C. 374, 128 F.2d 303. Certiorari was granted, 317 U.S. 609, 63 S.Ct. 52, 87 L.Ed. 494, and on February 1, 1943, the Supreme Court handed down an opinion directing us to remand to the Commission for further action not inconsistent therewith. Securities and Exchange Commission v. Chenery Corp., 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626. On rehearing no new or additional evidence was adduced and in February, 1945, the Commission reaffirmed its former order.

The case is now again before us pursuant to § 24(a) of the Act.

It should be borne in mind that on the previous appeal the Commission conceded that the transactions of which we have spoken were accomplished without ulterior purpose and without intent on petitioners' part to profit personally in the consummation of the plan, likewise held that honesty, full disclosure and purchase at a fair price at public sale characterized the transactions, and concluded that the result was neither unfair nor inequitable to the persons affected by the plan.

Accordingly, we had then, as we have now, a case in which there is not one jot or tittle of evidence tending to contradict petitioners' declared purpose in the purchase of preferred stocks to be the transfer of their interest from one class, declared by the Commission to be worthless, to another with voting rights, in order that to some extent they might make, as they thought, a safe investment and at the same time preserve some interest in a company to which they had devoted a considerable part of their business lives.

The Supreme Court subsequently held, as we had held, that the Commission's order on this record could not be sustained, but presumably, in order that the Commission might reconsider the case, in the light of the standards imposed by the Act, directed us to remand the cause to the Commission for further proceedings not inconsistent with its opinion. This action is in line with the Supreme Court's statement in the Pottsville case,[2] that an administrative determination open to judicial review does not impliedly foreclose the administrative agency, after its error has been corrected, from enforcing the legislative policy. Considered in this view, obviously, the only question now open is whether the Commission has rightly construed and rightly followed the opinion of the Supreme Court. That the Supreme Court can itself best answer this question goes without saying; but in the meantime it is our duty—which we may not escape by certification—to make, in the light of its content, our own interpretation of the opinion. As preliminary to this, it seems to us clear that the Supreme Court's rejection of the Commission's original order was primarily because it was not sustainable on the grounds on which the Commission based its action,— that is to say, the Commission having affirmatively found that petitioners' purchases of stock were in all respects fair, honest and aboveboard, resulting neither in unjust enrichment to themselves, nor harm to other stockholders or the public, such purchases were not subject to proscription on any ground relied upon by the Commission. And, as sustaining this, the Supreme Court said [318 U.S. 80, 63 S.Ct. 461]: "Congress itself did not proscribe the respondents' purchases of preferred stock in Federal.

---

[2] Federal Communications Commission v. Pottsville Broadcasting Co., 309 U.S. 134, 145, 60 S.Ct. 437, 84 L.Ed. 656.

Established judicial doctrines do not condemn these transactions. Nor has the Commission, acting under the rule-making powers delegated to it by § 11(e), promulgated new general standards of conduct."

The Commission, the Supreme Court said, dealt with this as a specific case, and not as the application of a general rule of conduct for reorganization managers, and as explanatory of this added: "Had the Commission, acting upon its experience and peculiar competence, promulgated a general rule of which its order here was a particular application, the problem for our consideration would be very different."

▮ In this aspect, then, the immediate question is whether the Commission's action in again outlawing petitioners' purchases of stocks, considered in the light of the Supreme Court's opinion, is a permissible exercise of administrative discretion entrusted to it by Congress. We are of opinion that its action cannot be sustained on that ground. The Commission, adhering to its original conclusion, stated its interpretation of the Supreme Court's directive in these words: "As we understand the opinion of the Supreme Court, our determination of 1941 in this case was held to be unsupported by certain equity precedents on which we relied. And as we construe the Supreme Court's mandate we are directed to re-examine the case to decide on the facts, viewed in the light of that conclusion of the Court, whether our special experience in administering the legislative policy of the Act indicates a necessity for reaffirming our previous determination or whether, instead, our earlier ruling should be modified."

Proceeding on this theory, the Commission declared that the problem is not a question of prescribing a standard of conduct generally applicable to trading "by corporate officers, directors and large stockholders," and expressly declined to adopt a rule applicable in such cases. The Commission says that "without flexibility" such a rule might itself "operate unfairly." It accordingly held that its decision must turn first, upon an affirmative finding by it that the plan was fair and equitable within the meaning of Section 11(e); second, that it was not detrimental to the interest of investors and consumers under Section 7(d) (6); and third, that it would not result in an unfair distribution of voting power under Section 7(e), and concluded that if the record left it with "undispelled doubts" on

the first question, the plan should be proscribed, "even if we (it) made no affirmative finding" in relation to the two other questions. Having reached this conclusion, the Commission, after citing instances in which, in the reorganization of corporations, "management" had availed of opportunities, or temptations, afforded by such proceedings to obtain personal advantage or gain, says that questions of " 'honesty, full disclosure and purchase at a fair price,' traditionally applied to dealings in normal course between corporate managers and stockholders, cannot be the controlling tests * * *." And on this basis the Commission reaffirmed its decision that petitioners' preferred stock must be placed on a different footing than that of other stockholders, saying:

"We are led to this result not by proof that the interveners committed acts of conscious wrongdoing but by the character of the conflicting interests created by the interveners' program of stock purchases carried out while plans for reorganization were under consideration. Doubts, inevitably suggested by the existence of these conflicting interests, remain unresolved and prevent an affirmative finding of fairness and equity under Section 11(e).

"The existence of such conflicting interests, and the persistence of unanswered questions they generate, similarly furnish the basis for a finding that component elements of the plan, * * * would be 'detrimental' within the meaning of Section 7(d) (6) and 7(e)."

The Commission's present view in no substantial respect differs from its original view except that then the Commission grounded its decision "on principles of equity derived from judicial decisions," whereas now it attempts to sustain its position on what it calls its special experience in administering the legislative policy of the Act.

▮ The Commission's position actually amounts to neither more nor less than a definite holding that purchases of stock of a corporation in process of reorganization are unlawful, when made by officers or employees of the corporation,—and this without regard to any factor of good or bad faith, or any other factor which might impute special knowledge, secret information, or indeed anything tending to show a lack of bona fides in the transaction. For, as we have seen, the Commission expressly

says the integrity of interveners in the respects in which they acted is not at issue. And as to this latter statement, in passing, we may properly observe that it cannot be, for the Commission has put that issue out of the case by its previous admission on the same facts that "honesty, full disclosure and purchase at a fair price" characterized the transactions. In practical effect, therefore, the Commission now insists upon doing precisely what the Supreme Court said it could not do; that is to say, in applying to this specific case a standard which has never been promulgated, either by the Commission in its regulations or by legislative act, and which the Commission says can not fairly be generally applied.

■■ Considered in this view, we think that the Commission has failed to interpret correctly the limits prescribed for its guidance by the Supreme Court. It is true, as the Commission now asserts, that the Supreme Court recognizes that the Act and its provisions confer upon it broad powers for the protection of the public and that this authority was intended to be responsive to the demands of the particular situations with which the Commission might be faced. But it is also true that the Court recognized that the Commission, like the ocean, has its appointed bounds, and lest it break through its limits and engulf a continent,— spoke these words of caution: "The Commission's action cannot be upheld merely because findings might have been made and considerations disclosed which would justify its order as an appropriate safeguard for the interests protected by the Act." And the Court added this further caution that the grounds upon which the administrative agency acts must be clearly disclosed and adequately sustained.

■ But the Commission has made no additional findings and disclosed no additional considerations to justify its adherence to its former order. In short, its attitude seems to be that Section 11(e) of the Act,[3] confers a purely discretionary power not subject to judicial review. But we are referred to nothing and can find nothing in the Act to sustain this view. Nor is it sustainable on the theory of Congressional intent, for as we pointed out in our earlier opinion, the Senate Committee's report on submission of the bill declared that the authority of the Commission must be administered within the well defined limits of the Act; and the Act itself certainly confers no such grant of general power.

Section 11(e), which delineates the Commission's power, reads in part "If, after notice and opportunity for hearing, the Commission shall find such plan * * * necessary to effectuate the provisions of subsection (b) and fair and equitable to the persons affected by such plan, the Commission shall make an order approving such plan * * *."

The words of the section "notice and opportunity for hearing," cannot, we think, be held to erect a standard of judgment so indefinite as to confer unlimited powers, but rather to impose and require quasi judicial action. And as Mr. Justice Brandeis said of similar authority conferred by Section 5(2) of the Act to Regulate Commerce, 49 U.S.C.A. § 5(2),[4] "Upon application of a carrier, the Commission must form a judgment whether the acquisition proposed will be in the public interest. It may form this judgment only after hearing. The provision for a hearing implies both the privilege of introducing evidence and the duty of deciding in accordance with it. To re-

---

[3] § 11(e): "In accordance with such rules and regulations or order as the Commission may deem necessary or appropriate in the public interest or for the protection of investors or consumers, any registered holding company * * * may * * * submit a plan to the Commission for the divestment of control, securities, or other assets, or for other action by such company * * * for the purpose of enabling such company * * * to comply with the provisions of subsection (b). *If, after notice and opportunity for hearing, the Commission shall find such plan, as submitted or as modified, necessary to effectuate* the provisions of subsection (b) and *fair and equitable to the persons affected by such plan*, the Commission shall

make an order approving such plan * * *." (Emphasis added.)

[4] Chicago Junction Case, 264 U.S. 258, 265, 44 S.Ct. 317, 319, 68 L.Ed. 667. See also Shields v. Utah Idaho R. Co., 305 U.S. 177, 59 S.Ct. 160, 83 L.Ed. 111; Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197–230, 59 S.Ct. 206, 83 L.Ed. 126; Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 48, 49, 58 S.Ct. 459, 82 L.Ed. 638; Anniston Mfg. Co. v. Davis, 301 U.S. 337, 345, 346, 57 S.Ct. 816, 81 L.Ed. 1143; St. Joseph Stockyards Co. v. United States, 298 U.S. 38, 51–54, 56 S.Ct. 720, 80 L.Ed. 1033; I. C. C. v. Louisville & N. R. Co., 227 U.S. 88, 90, 91, 33 S.Ct. 185, 57 L.Ed. 431.

[redacted]

fuse to consider evidence introduced or to make an essential finding without supporting evidence is arbitrary action."

That such a limitation is obviously necessary was recently emphasized by the Supreme Court in the Pottsville case[5] in which Mr. Justice Frankfurter said: "To be sure, the laws under which these agencies operate prescribe the fundamentals of fair play. They require that interested parties be afforded an opportunity for hearing and that judgment must express a reasoned conclusion."

Certainly, a reasoned conclusion must be based on evidence, and may not be pitched alone on unresolved doubts, nor upon weaknesses or selfishness which the Commission believes is inherent in human nature. The construction advanced by the Commission would permit it to exercise a power of disapproval free of judicial review, and the notice and hearing required by the statute would become an empty form. The Commission, free of the inhibitions imposed by the particular facts, would be left to roam the widest possible area of authority influenced and impelled only by its own doubts.

Thus considered, it is apparent that the Commission has made its present order without reliance upon such evidence or findings as would warrant our affirmance. Compare National Labor Relations Board v. Columbian Co., 306 U.S. 292-299, 59 S.Ct. 501, 83 L.Ed. 660. In no respect, as we have said, has the Commission made the findings to support the present order as appropriate effectuate the policies of the Act, or to show that petitioners' actions were other than fair and equitable, or that their participation in the merger scheme would be detrimental to the public interest or to the interest of investors or consumers. In laying down, as it does, a rule of fiat unassociated with the facts in this case, the Commission has strayed from the course laid out and charted by the opinion of the Supreme Court, and accordingly we must refuse to give it effect.

Mr. Justice Frankfurter, who spoke for the Supreme Court, and whose language we have previously quoted in recognition of the broad powers of the Commission, said of the Commission's former order:[6] "* * * Whether and to what extent directors or officers should be prohibited from buying or selling stock of the corporation during its reorganization, presents problems of policy for the judgment of Congress or of the body to which it has delegated power to deal with the matter. Abuse of corporate position, influence, and access to information may raise questions so subtle that the law can deal with them effectively only by prohibitions not concerned with the fairness of a particular transaction. *But before transactions otherwise legal can be outlawed or denied their usual business consequences, they must fall under the ban of some standards of conduct prescribed by an agency of government authorized to prescribe such standards*—either the courts or Congress or an agency to which Congress has delegated its authority. Congress itself did not proscribe the respondents' purchases of preferred stock in Federal. Established judicial doctrines do not condemn these transactions. Nor has the Commission, acting under the rule-making powers delegated to it by § 11(e), promulgated new general standards of conduct. It purported merely to be applying an existing judge-made rule of equity. The Commission's determination can stand, therefore, only if it found that the specific transactions under scrutiny showed misuse by the respondents of their position as reorganization managers, in that as such managers they took advantage of the corporation or the other stockholders or the investing public. The record is utterly barren of any such showing. Indeed, such a claim against the respondents was explicitly disavowed by the Commission." (Emphasis added.)

This language, we think, is equally applicable to the present order, for it is clear now, as it was before, that the Commission has prescribed no fixed standards of conduct which would ban the stock purchases in question, nor promulgated before or since any rule applicable thereto, but, on the contrary, has declined to adopt standards or promulgate a rule, on the ground that no rule or standard which would be fair and equitable in all cases can be made. Certainly, then, it would seem to us to follow that in a case in which the Commission points to no fact challenging good faith, suggests no betrayal of a fiduciary duty, and hints at no use of inside or confidential information, a holding of illegality is not responsive to the Court's conclusion

5 Supra, Note 2, 309 U.S. at pages 143, 144, 60 S.Ct. at page 442, 84 L.Ed. 656.

6 S. E. C. v. Chenery Corp., 318 U.S. 80, 92, 93, 63 S.Ct. 454, 461, 87 L.Ed. 626.

that "The Commission's determination can stand, therefore, only if it found that the specific transactions under scrutiny showed misuse by the respondents of their position as reorganization managers, in that as such managers they took advantage of the corporation or the other stockholders or the investing public." It may well be, as the Supreme Court suggests, that the Commission's fact-finding functions are like those of a jury. But nothing is more positively imbedded in our law than the principle that a jury may not guess or speculate in deciding facts. Certainly, neither in a court nor before a Commission can an unsupported suspicion sustain a decision.

■ In nothing we have said do we wish to be understood as expressing any opinion as to the right of the Commission under its broad powers to promulgate a rule of general application forbidding officers and directors of a corporation in process of reorganization from buying—and perhaps also from selling—securities of the corporation during the pendency of proceedings before the Commission. That question is not present in this case. What we do say is that, without such a rule, of which notice is given so that all may know of its existence, transactions in themselves fair and just and honest and in accord with traditional business practices, and which "Congress itself did not proscribe," and which "judicial doctrines do not condemn," may not properly be "outlawed or denied" their ordinary effect.

But here the Commission's position goes beyond the mere question of the necessity of a rule. It insists upon an absolute right to approve in one case and to refuse to approve in another. It says, quite frankly, that it would be inappropriate to condemn a transaction such as we have here in a case in which the cost of the security purchased was in excess of its reorganization value; and again that it might be inconvenient to apply it if to do so would embarrass the corporation's finances. These are but instances which demonstrate its claim to unfettered discretion, irrespective of adequate findings based upon a fair appraisal of the evidence. Nothing that we find in the opinion of the Supreme Court warrants such a conclusion and nothing could be more directly in conflict with the terms and spirit of the law.

Reversed.