SECURITIES & EXCHANGE COMMISSION *v.*
CHENERY CORPORATION ET AL.

NO. 81.

Argued December 13, 16, 1946.—Decided June 23, 1947.

*Roger S. Foster* argued the cause for petitioner. With him on the brief were *Solicitor General McGrath* and *Theodore L. Thau.*

196

*Spencer Gordon* argued the cause and filed a brief for respondents in No. 81.

*Allen S. Hubbard* argued the cause and filed a brief for respondent in No. 82.

MR. JUSTICE MURPHY delivered the opinion of the Court.

This case is here for the second time. In *S. E. C.* v. *Chenery Corp.,* 318 U. S. 80, we held that an order of the Securities and Exchange Commission could not be sustained on the grounds upon which that agency acted. We therefore directed that the case be remanded to the Commission for such further proceedings as might be appropriate. On remand, the Commission reexamined the problem, recast its rationale and reached the same result. The issue now is whether the Commission's action is proper in light of the principles established in our prior decision.

When the case was first here, we emphasized a simple but fundamental rule of administrative law. That rule is to the effect that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis. To do so would propel the court into the domain which Congress has set aside exclusively for the administrative agency.

We also emphasized in our prior decision an important corollary of the foregoing rule. If the administrative action is to be tested by the basis upon which it purports to rest, that basis must be set forth with such clarity as to be understandable. It will not do for a court to be com-

pelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive. In other words, "We must know what a decision means before the duty becomes ours to say whether it is right or wrong." *United States* v. *Chicago, M., St. P. & P. R. Co.,* 294 U. S. 499, 511.

Applying this rule and its corollary, the Court was unable to sustain the Commission's original action. The Commission had been dealing with the reorganization of the Federal Water Service Corporation (Federal), a holding company registered under the Public Utility Holding Company Act of 1935, 49 Stat. 803. During the period when successive reorganization plans proposed by the management were before the Commission, the officers, directors and controlling stockholders of Federal purchased a substantial amount of Federal's preferred stock on the over-the-counter market. Under the fourth reorganization plan, this preferred stock was to be converted into common stock of a new corporation; on the basis of the purchases of preferred stock, the management would have received more than 10% of this new common stock. It was frankly admitted that the management's purpose in buying the preferred stock was to protect its interest in the new company. It was also plain that there was no fraud or lack of disclosure in making these purchases.

But the Commission would not approve the fourth plan so long as the preferred stock purchased by the management was to be treated on a parity with the other preferred stock. It felt that the officers and directors of a holding company in process of reorganization under the Act were fiduciaries and were under a duty not to trade in the securities of that company during the reorganization period. 8 S. E. C. 893, 915–921. And so the plan was amended to provide that the preferred stock acquired by the management, unlike that held by others, was not to be con-

verted into the new common stock; instead, it was to be surrendered at cost plus dividends accumulated since the purchase dates. As amended, the plan was approved by the Commission over the management's objections. 10 S. E. C. 200.

The Court interpreted the Commission's order approving this amended plan as grounded solely upon judicial authority. The Commission appeared to have treated the preferred stock acquired by the management in accordance with what it thought were standards theretofore recognized by courts. If it intended to create new standards growing out of its experience in effectuating the legislative policy, it failed to express itself with sufficient clarity and precision to be so understood. Hence the order was judged by the only standards clearly invoked by the Commission. On that basis, the order could not stand. The opinion pointed out that courts do not impose upon officers and directors of a corporation any fiduciary duty to its stockholders which precludes them, merely because they are officers and directors, from buying and selling the corporation's stock. Nor was it felt that the cases upon which the Commission relied established any principles of law or equity which in themselves would be sufficient to justify this order.

The opinion further noted that neither Congress nor the Commission had promulgated any general rule proscribing such action as the purchase of preferred stock by Federal's management. And the only judge-made rule of equity which might have justified the Commission's order related to fraud or mismanagement of the reorganization by the officers and directors, matters which were admittedly absent in this situation.

After the case was remanded to the Commission, Federal Water and Gas Corp. (Federal Water), the surviving corporation under the reorganization plan, made an application for approval of an amendment to the plan to provide

for the issuance of new common stock of the reorganized company. This stock was to be distributed to the members of Federal's management on the basis of the shares of the old preferred stock which they had acquired during the period of reorganization, thereby placing them in the same position as the public holders of the old preferred stock. The intervening members of Federal's management joined in this request. The Commission denied the application in an order issued on February 8, 1945. Holding Company Act Release No. 5584. That order was reversed by the Court of Appeals, 80 U. S. App. D. C. 365, 154 F. 2d 6, which felt that our prior decision precluded such action by the Commission.

The latest order of the Commission definitely avoids the fatal error of relying on judicial precedents which do not sustain it. This time, after a thorough reexamination of the problem in light of the purposes and standards of the Holding Company Act, the Commission has concluded that the proposed transaction is inconsistent with the standards of §§ 7 and 11 of the Act. It has drawn heavily upon its accumulated experience in dealing with utility reorganizations. And it has expressed its reasons with a clarity and thoroughness that admit of no doubt as to the underlying basis of its order.

The argument is pressed upon us, however, that the Commission was foreclosed from taking such a step following our prior decision. It is said that, in the absence of findings of conscious wrongdoing on the part of Federal's management, the Commission could not determine by an order in this particular case that it was inconsistent with the statutory standards to permit Federal's management to realize a profit through the reorganization purchases. All that it could do was to enter an order allowing an amendment to the plan so that the proposed transaction could be consummated. Under this view, the Commission would be free only to promulgate a general rule

outlawing such profits in future utility reorganizations; but such a rule would have to be prospective in nature and have no retroactive effect upon the instant situation.

We reject this contention, for it grows out of a misapprehension of our prior decision and of the Commission's statutory duties. We held no more and no less than that the Commission's first order was unsupportable for the reasons supplied by that agency. But when the case left this Court, the problem whether Federal's management should be treated equally with other preferred stockholders still lacked a final and complete answer. It was clear that the Commission could not give a negative answer by resort to prior judicial declarations. And it was also clear that the Commission was not bound by settled judicial precedents in a situation of this nature. 318 U. S. at 89. Still unsettled, however, was the answer the Commission might give were it to bring to bear on the facts the proper administrative and statutory considerations, a function which belongs exclusively to the Commission in the first instance. The administrative process had taken an erroneous rather than a final turn. Hence we carefully refrained from expressing any views as to the propriety of an order rooted in the proper and relevant considerations. See *Siegel Co.* v. *Federal Trade Commission,* 327 U. S. 608, 613–614.

When the case was directed to be remanded to the Commission for such further proceedings as might be appropriate, it was with the thought that the Commission would give full effect to its duties in harmony with the views we had expressed. *Ford Motor Co.* v. *Labor Board,* 305 U. S. 364, 374; *Federal Radio Commission* v. *Nelson Bros. Co.,* 289 U. S. 266, 278. This obviously meant something more than the entry of a perfunctory order giving parity treatment to the management holdings of preferred stock. The fact that the Commission had committed a legal error in its first disposition of the case certainly gave Federal's

management no vested right to receive the benefits of such an order. See *Federal Communications Commission* v. *Pottsville Broadcasting Co.,* 309 U. S. 134, 145. After the remand was made, therefore, the Commission was bound to deal with the problem afresh, performing the function delegated to it by Congress. It was again charged with the duty of measuring the proposed treatment of the management's preferred stock holdings by relevant and proper standards. Only in that way could the legislative policies embodied in the Act be effectuated. Cf. *Labor Board* v. *Donnelly Co.,* 330 U. S. 219, 227–228.

The absence of a general rule or regulation governing management trading during reorganization did not affect the Commission's duties in relation to the particular proposal before it. The Commission was asked to grant or deny effectiveness to a proposed amendment to Federal's reorganization plan whereby the management would be accorded parity treatment on its holdings. It could do that only in the form of an order, entered after a due consideration of the particular facts in light of the relevant and proper standards. That was true regardless of whether those standards previously had been spelled out in a general rule or regulation. Indeed, if the Commission rightly felt that the proposed amendment was inconsistent with those standards, an order giving effect to the amendment merely because there was no general rule or regulation covering the matter would be unjustified.

It is true that our prior decision explicitly recognized the possibility that the Commission might have promulgated a general rule dealing with this problem under its statutory rule-making powers, in which case the issue for our consideration would have been entirely different from that which did confront us. 318 U. S. 92–93. But we did not mean to imply thereby that the failure of the Commission to anticipate this problem and to promulgate a general rule withdrew all power from that agency to per-

form its statutory duty in this case. To hold that the Commission had no alternative in this proceeding but to approve the proposed transaction, while formulating any general rules it might desire for use in future cases of this nature, would be to stultify the administrative process. That we refuse to do.

Since the Commission, unlike a court, does have the ability to make new law prospectively through the exercise of its rule-making powers, it has less reason to rely upon *ad hoc* adjudication to formulate new standards of conduct within the framework of the Holding Company Act. The function of filling in the interstices of the Act should be performed, as much as possible, through this quasi-legislative promulgation of rules to be applied in the future. But any rigid requirement to that effect would make the administrative process inflexible and incapable of dealing with many of the specialized problems which arise. See Report of the Attorney General's Committee on Administrative Procedure in Government Agencies, S. Doc. No. 8, 77th Cong., 1st Sess., p. 29. Not every principle essential to the effective administration of a statute can or should be cast immediately into the mold of a general rule. Some principles must await their own development, while others must be adjusted to meet particular, unforeseeable situations. In performing its important functions in these respects, therefore, an administrative agency must be equipped to act either by general rule or by individual order. To insist upon one form of action to the exclusion of the other is to exalt form over necessity.

In other words, problems may arise in a case which the administrative agency could not reasonably foresee, problems which must be solved despite the absence of a relevant general rule. Or the agency may not have had sufficient experience with a particular problem to warrant rigidifying its tentative judgment into a hard and fast rule. Or

the problem may be so specialized and varying in nature as to be impossible of capture within the boundaries of a general rule. In those situations, the agency must retain power to deal with the problems on a case-to-case basis if the administrative process is to be effective. There is thus a very definite place for the case-by-case evolution of statutory standards. And the choice made between proceeding by general rule or by individual, *ad hoc* litigation is one that lies primarily in the informed discretion of the administrative agency. See *Columbia Broadcasting System* v. *United States,* 316 U. S. 407, 421.

Hence we refuse to say that the Commission, which had not previously been confronted with the problem of management trading during reorganization, was forbidden from utilizing this particular proceeding for announcing and applying a new standard of conduct. Cf. *Federal Trade Commission* v. *Keppel & Bro.,* 291 U. S. 304. That such action might have a retroactive effect was not necessarily fatal to its validity. Every case of first impression has a retroactive effect, whether the new principle is announced by a court or by an administrative agency. But such retroactivity must be balanced against the mischief of producing a result which is contrary to a statutory design or to legal and equitable principles. If that mischief is greater than the ill effect of the retroactive application of a new standard, it is not the type of retroactivity which is condemned by law. See *Addison* v. *Holly Hill Co.,* 322 U. S. 607, 620.

And so in this case, the fact that the Commission's order might retroactively prevent Federal's management from securing the profits and control which were the objects of the preferred stock purchases may well be outweighed by the dangers inherent in such purchases from the statutory standpoint. If that is true, the argument of retroactivity becomes nothing more than a claim that the Commission lacks power to enforce the standards of

the Act in this proceeding. Such a claim deserves rejection.

The problem in this case thus resolves itself into a determination of whether the Commission's action in denying effectiveness to the proposed amendment to the Federal reorganization plan can be justified on the basis upon which it clearly rests. As we have noted, the Commission avoided placing its sole reliance on inapplicable judicial precedents. Rather it has derived its conclusions from the particular facts in the case, its general experience in reorganization matters and its informed view of statutory requirements. It is those matters which are the guide for our review.

The Commission concluded that it could not find that the reorganization plan, if amended as proposed, would be "fair and equitable to the persons affected thereby" within the meaning of § 11 (e) of the Act, under which the reorganization was taking place. Its view was that the amended plan would involve the issuance of securities on terms "detrimental to the public interest or the interest of investors" contrary to §§ 7 (d) (6) and 7 (e), and would result in an "unfair or inequitable distribution of voting power" among the Federal security holders within the meaning of § 7 (e). It was led to this result "not by proof that the interveners [Federal's management] committed acts of conscious wrongdoing but by the character of the conflicting interests created by the interveners' program of stock purchases carried out while plans for reorganization were under consideration."

The Commission noted that Federal's management controlled a large multi-state utility system and that its influence permeated down to the lowest tier of operating companies. The financial, operational and accounting policies of the parent and its subsidiaries were therefore under the management's strict control. The broad range of business judgments vested in Federal's management

multiplied opportunities for affecting the market price of Federal's outstanding securities and made the exercise of judgment on any matter a subject of greatest significance to investors. Added to these normal managerial powers, the Commission pointed out that a holding company management obtains special powers in the course of a voluntary reorganization under § 11 (e) of the Holding Company Act. The management represents the stockholders in such a reorganization, initiates the proceeding, draws up and files the plan, and can file amendments thereto at any time. These additional powers may introduce conflicts between the management's normal interests and its responsibilities to the various classes of stockholders which it represents in the reorganization. Moreover, because of its representative status, the management has special opportunities to obtain advance information of the attitude of the Commission.

Drawing upon its experience, the Commission indicated that all these normal and special powers of the holding company management during the course of a § 11 (e) reorganization placed in the management's command "a formidable battery of devices that would enable it, if it should choose to use them selfishly, to affect in material degree the ultimate allocation of new securities among the various existing classes, to influence the market for its own gain, and to manipulate or obstruct the reorganization required by the mandate of the statute." In that setting, the Commission felt that a management program of stock purchase would give rise to the temptation and the opportunity to shape the reorganization proceeding so as to encourage public selling on the market at low prices. No management could engage in such a program without raising serious questions as to whether its personal interests had not opposed its duties "to exercise disinterested judgment in matters pertaining to subsidiaries' accounting, budgetary and dividend policies, to present

publicly an unprejudiced financial picture of the enterprise, and to effectuate a fair and feasible plan expeditiously."

The Commission further felt that its answer should be the same even where proof of intentional wrongdoing on the management's part is lacking. Assuming a conflict of interests, the Commission thought that the absence of actual misconduct is immaterial; injury to the public investors and to the corporation may result just as readily. "Questionable transactions may be explained away, and an abuse of investors and the administrative process may be perpetrated without evil intent, yet the injury will remain." Moreover, the Commission was of the view that the delays and the difficulties involved in probing the mental processes and personal integrity of corporate officials do not warrant any distinction on the basis of evil intent, the plain fact being "that an absence of unfairness or detriment in cases of this sort would be practically impossible to establish by proof."

Turning to the facts in this case, the Commission noted the salient fact that the primary object of Federal's management in buying the preferred stock was admittedly to obtain the voting power that was accruing to that stock through the reorganization and to profit from the investment therein. That stock had been purchased in the market at prices that were depressed in relation to what the management anticipated would be, and what in fact was, the earning and asset value of its reorganization equivalent. The Commission admitted that the good faith and personal integrity of this management were not in question; but as to the management's justification of its motives, the Commission concluded that it was merely trying to "deny that they made selfish use of their powers during the period when their conflict of interest, vis-a-vis public investors, was in existence owing to their purchase program." Federal's management had

thus placed itself in a position where it was "peculiarly susceptible to temptation to conduct the reorganization for personal gain rather than the public good" and where its desire to make advantageous purchases of stock could have an important influence, even though subconsciously, upon many of the decisions to be made in the course of the reorganization. Accordingly, the Commission felt that all of its general considerations of the problem were applicable to this case.

The scope of our review of an administrative order wherein a new principle is announced and applied is no different from that which pertains to ordinary administrative action. The wisdom of the principle adopted is none of our concern. See *Board of Trade* v. *United States,* 314 U. S. 534, 548. Our duty is at an end when it becomes evident that the Commission's action is based upon substantial evidence and is consistent with the authority granted by Congress. See *National Broadcasting Co.* v. *United States,* 319 U. S. 190, 224.

We are unable to say in this case that the Commission erred in reaching the result it did. The facts being undisputed, we are free to disturb the Commission's conclusion only if it lacks any rational and statutory foundation. In that connection, the Commission has made a thorough examination of the problem, utilizing statutory standards and its own accumulated experience with reorganization matters. In essence, it has made what we indicated in our prior opinion would be an informed, expert judgment on the problem. It has taken into account "those more subtle factors in the marketing of utility company securities that gave rise to the very grave evils which the Public Utility Holding [Company] Act of 1935 was designed to correct" and has relied upon the fact that "Abuse of corporate position, influence, and access to information may raise questions so subtle that the law can deal with them effectively only by prohi-

bitions not concerned with the fairness of a particular transaction." 318 U. S. at 92.

Such factors may properly be considered by the Commission in determining whether to approve a plan of reorganization of a utility holding company, or an amendment to such a plan. The "fair and equitable" rule of § 11 (e) and the standard of what is "detrimental to the public interest or the interest of investors or consumers" under § 7 (d) (6) and § 7 (e) were inserted by the framers of the Act in order that the Commission might have broad powers to protect the various interests at stake. 318 U. S. at 90–91. The application of those criteria, whether in the form of a particular order or a general regulation, necessarily requires the use of informed discretion by the Commission. The very breadth of the statutory language precludes a reversal of the Commission's judgment save where it has plainly abused its discretion in these matters. See *United States* v. *Lowden,* 308 U. S. 225; *I. C. C.* v. *Railway Labor Assn.,* 315 U. S. 373. Such an abuse is not present in this case.

The purchase by a holding company management of that company's securities during the course of a reorganization may well be thought to be so fraught with danger as to warrant a denial of the benefits and profits accruing to the management. The possibility that such a stock purchase program will result in detriment to the public investors is not a fanciful one. The influence that program may have upon the important decisions to be made by the management during reorganization is not inconsequential. Since the officers and directors occupy fiduciary positions during this period, their actions are to be held to a higher standard than that imposed upon the general investing public. There is thus a reasonable basis for a judgment that the benefits and profits accruing to the management from the stock purchases should be prohibited, regardless of the good faith involved. And

it is a judgment that can justifiably be reached in terms of fairness and equitableness, to the end that the interests of the public, the investors and the consumers might be protected. But it is a judgment based upon public policy, a judgment which Congress has indicated is of the type for the Commission to make.

The Commission's conclusion here rests squarely in that area where administrative judgments are entitled to the greatest amount of weight by appellate courts. It is the product of administrative experience, appreciation of the complexities of the problem, realization of the statutory policies, and responsible treatment of the uncontested facts. It is the type of judgment which administrative agencies are best equipped to make and which justifies the use of the administrative process. See *Republic Aviation Corp.* v. *Labor Board,* 324 U. S. 793, 800. Whether we agree or disagree with the result reached, it is an allowable judgment which we cannot disturb.

*Reversed.*

Mr. Justice Burton concurs in the result.

The Chief Justice and Mr. Justice Douglas took no part in the consideration or decision of these cases.

Mr. Justice Frankfurter and Mr. Justice Jackson dissent, but there is not now opportunity for a response adequate to the issues raised by the Court's opinion. These concern the rule of law in its application to the administrative process and the function of this Court in reviewing administrative action. Accordingly, the detailed grounds for dissent will be filed in due course.

Mr. Justice Jackson, dissenting.*

The Court by this present decision sustains the identical administrative order which only recently it held invalid.

---

*Filed October 6, 1947.

*S. E. C.* v. *Chenery Corp.,* 318 U. S. 80.   As the Court correctly notes, the Commission has only "recast its rationale and reached the same result."   (Par. 1.)[1]   There being no change in the order, no additional evidence in the record and no amendment of relevant legislation, it is clear that there has been a shift in attitude between that of the controlling membership of the Court when the case was first here and that of those who have the power of decision on this second review.

I feel constrained to disagree with the reasoning offered to rationalize this shift.   It makes judicial review of administrative orders a hopeless formality for the litigant, even where granted to him by Congress.   It reduces the judicial process in such cases to a mere feint.   While the opinion does not have the adherence of a majority of the full Court, if its pronouncements should become governing principles they would, in practice, put most administrative orders over and above the law.

## I.

The essential facts are few and are not in dispute.[2]   This corporation filed with the Securities and Exchange Commission a voluntary plan of reorganization.   While the reorganization proceedings were pending sixteen officers and directors bought on the open market about $7\frac{1}{2}\%$ of the corporation's preferred stock.   Both the Commission and the Court admit that these purchases were not forbidden by any law, judicial precedent, regulation or rule of the Commission.   Nevertheless, the Commission has

---

[1] For convenience of reference, I have numbered consecutively the paragraphs of the Court's opinion, and cite quotations accordingly.

[2] The facts and the law of the case generally are fully set forth in the first opinion of Mr. Chief Justice Groner of the Court of Appeals which reversed the Commission's order (75 U. S. App. D. C. 374, 128 F. 2d 303) and in his second opinion (80 U. S. App. D. C. 365, 154 F. 2d 6) again reversing the Commission's order after it had "recast its rationale."

ordered these individuals to surrender their shares to the corporation at cost, plus 4% interest, and the Court now approves that order.

It is helpful, before considering whether this order is authorized by law, to reflect on what it is and what it is not. It is not conceivably a discharge of the Commission's duty to determine whether a proposed plan of reorganization would be "fair and equitable." It has nothing to do with the corporate structure, or the classes and amounts of stock, or voting rights or dividend preferences. It does not remotely affect the impersonal financial or legal factors of the plan. It is a personal deprivation denying particular persons the right to continue to own their stock and to exercise its privileges. Other persons who bought at the same time and price in the open market would be allowed to keep and convert their stock. Thus, the order is in no sense an exercise of the function of control over the terms and relations of the corporate securities.

Neither is the order one merely to regulate the future use of property. It literally takes valuable property away from its lawful owners for the benefit of other private parties without full compensation and the Court expressly approves the taking. It says that the stock owned by these persons is denied conversion along with similar stock owned by others; "instead, it was to be surrendered at cost plus dividends accumulated since the purchase dates." (Par. 5.) It should be noted that this formula was subsequently altered to read "cost plus 4% interest." That this basis was less than its value is recognized, for the Court says "That stock had been purchased in the market at prices that were depressed in relation to what the management anticipated would be, and what in fact was, the earning and asset value of its reorganization equivalent." (Par. 24.) Admittedly, the value above cost, and interest on it, simply is taken from the owners,

without compensation. No such power has ever been confirmed in any administrative body.

It should also be noted that neither the Court nor the Commission purports to adjudge a forfeiture of this property as a consequence of sharp dealing or breach of trust. The Court says, "The Commission admitted that the good faith and personal integrity of this management were not in question; . . . ." (Par. 24.) And again, "It was frankly admitted that the management's purpose in buying the preferred stock was to protect its interest in the new company. It was also plain that there was no fraud or lack of disclosure in making these purchases." (Par. 4.)

## II.

The reversal of the position of this Court is due to a fundamental change in prevailing philosophy. The basic assumption of the earlier opinion as therein stated was, *"But before transactions otherwise legal can be outlawed or denied their usual business consequences, they must fall under the ban of some standards of conduct prescribed by an agency of government authorized to prescribe such standards . . . ."* S. E. C. v. *Chenery Corp.*, 318 U. S. 80, 92–93. The basic assumption of the present opinion is stated thus: *"The absence of a general rule or regulation governing management trading during reorganization did not affect the Commission's duties in relation to the particular proposal before it."* (Par. 13.) This puts in juxtaposition the two conflicting philosophies which produce opposite results in the same case and on the same facts. The difference between the first and the latest decision of the Court is thus simply the difference between holding that administrative orders must have a basis in law and a holding that absence of a legal basis is no ground on which courts may annul them.

As there admittedly is no law or regulation to support this order, we peruse the Court's opinion diligently to find

on what grounds it is now held that the Court of Appeals, on pain of being reversed for error, was required to stamp this order with its approval. We find but one. That is the principle of judicial deference to administrative experience. That argument is five times stressed in as many different contexts, and I quote just enough to identify the instances: "The Commission," it says, "has drawn heavily upon its accumulated experience in dealing with utility reorganizations." (Par. 9.) "Rather it has derived its conclusions from the particular facts in the case, its general experience in reorganization matters and its informed view of statutory requirements." (Par. 19.) "Drawing upon its experience, the Commission indicated . . . ," etc. (Par. 22.) ". . . the Commission has made a thorough examination of the problem, utilizing statutory standards and its own accumulated experience with reorganization matters." (Par. 26.) And finally, of the order the Court says, "It is the product of administrative experience," etc. (Par. 29.)

What are we to make of this reiterated deference to "administrative experience" when in another context the Court says, "Hence, we refuse to say that the Commission, *which had not previously been confronted with the problem of management trading during reorganization,* was forbidden from utilizing this particular proceeding for announcing and applying *a new standard of conduct.*"? (Par. 17.) (Emphasis supplied.)

The Court's reasoning adds up to this: The Commission must be sustained because of its accumulated experience in solving a problem with which it had never before been confronted!

Of course, thus to uphold the Commission by professing to find that it has enunciated a "new standard of conduct" brings the Court squarely against the invalidity of retroactive law-making. But the Court does not falter. "That such action might have a retroactive effect

was not necessarily fatal to its validity." (Par. 17.) "But such retroactivity must be balanced against the mischief of producing a result which is contrary to a statutory design or to legal and equitable principles." (Par. 17.) Of course, if what these parties did really was condemned by "statutory design" or "legal and equitable principles," it could be stopped without resort to a new rule and there would be no retroactivity to condone. But if it had been the Court's view that some law already prohibited the purchases, it would hardly have been necessary three sentences earlier to hold that the Commission was not prohibited "from utilizing this particular proceeding for announcing and applying a *new standard of conduct.*" (Par. 17.) (Emphasis supplied.)

I give up. Now I realize fully what Mark Twain meant when he said, "The more you explain it, the more I don't understand it."

## III.

But one does not need to comprehend the processes by which other minds reach a given result in order to estimate the practical consequences of their pronouncement upon judicial review of administrative orders.

If it is of no consequence that no rule of law be existent to support an administrative order, and the Court of Appeals is obliged to defer to administrative experience and to sustain a Commission's power merely because it has been asserted and exercised, of what use is it to print a record or briefs in the case, or to hear argument? Administrative experience always is present, at least to the degree that it is here, and would always dictate a like deference by this Court to an assertion of administrative power. Must the reviewing court, as this Court does in this opinion, support the order on a presumptive or imputed experience even though the Court is obliged to discredit such experience in the very same opinion? Is

fictitious experience to be conclusive in matters of law and particularly in the interpretation of statutes, as the Court's opinion now intimates, or just in fact finding which has been the function which the Court has heretofore sustained upon the argument of administrative experience?

I suggest that administrative experience is of weight in judicial review only to this point—it is a persuasive reason for deference to the Commission in the exercise of its discretionary powers under and within the law. It cannot be invoked to support action outside of the law. And what action is, and what is not, within the law must be determined by courts, when authorized to review, no matter how much deference is due to the agency's fact finding. Surely an administrative agency is not a law unto itself, but the Court does not really face up to the fact that this is the justification it is offering for sustaining the Commission action.

Even if the Commission had, as the Court says, utilized this case to announce a new legal standard of conduct, there would be hurdles to be cleared, but we need not dwell on them now. Because to promulgate a general rule of law, either by regulation or by case law, is something the Commission expressly declined to do. It did not previously promulgate, and it does not by this order profess to promulgate, any rule or regulation to prohibit such purchases absolutely or under stated conditions. On the other hand, its position is that no such rule or standard would be fair and equitable in all cases.[3]

---

[3] The Commission, speaking of such a rule, appends the following note to its opinion:

"Without flexibility the rule might itself operate unfairly. Limitation to cost appears appropriate here, but would be inappropriate in a case where the cost of the security purchased was in excess of its reorganization value, and in some instances cash payment by the company would not be feasible. In addition, special treatment of any sort might be inappropriate for incidental purchases not made

## IV.

Whether, as matter of policy, corporate managers during reorganization should be prohibited from buying or selling its stock, is not a question for us to decide. But it is for us to decide whether, so long as no law or regulation prohibits them from buying, their purchases may be forfeited, or not, in the discretion of the Commission. If such a power exists in words of the statute or in their implication, it would be possible to point it out and thus end the case. Instead, the Court admits that there was no law prohibiting these purchases when they were made, or at any time thereafter. And, except for this decision, there is none now.

The truth is that in this decision the Court approves the Commission's assertion of power to govern the matter *without* law, power to force surrender of stock so purchased whenever it will, and power also to overlook such acquisitions if it so chooses. The reasons which will lead it to take one course as against the other remain locked in its own breast, and it has not and apparently does not intend to commit them to any rule or regulation. This administrative authoritarianism, this power to decide without law, is what the Court seems to approve in so many words: "The absence of a general rule or regulation

as part of a program in contemplation of reorganization benefits. In this connection, we wish to emphasize that our concern here is not primarily with the normal corporate powers which make it possible for officers and directors to influence the market for their own gain, in the absence of reorganization, by a choice of dividend policies, accounting practices, published reports, and the like. The questions of fairness and detriment here presented arise before us in the context of a capital readjustment. At that point our scrutiny is called for, and that our scrutiny is to be vigilant cannot be doubted. See Appendix to Sen. Rep. No. 621 (74th Cong., 1st Sess.) on S. 2796, at p. 58, quoted supra."

governing management trading during reorganization did not affect the Commission's duties . . . ." (Par. 13). This seems to me to undervalue and to belittle the place of law, even in the system of administrative justice. It calls to mind Mr. Justice Cardozo's statement that "Law as a guide to conduct is reduced to the level of mere futility if it is unknown and unknowable." [4]

## V.

The Court's averment concerning this order, that "It is the type of judgment which administrative agencies are best equipped to make and which justifies the use of the administrative process," (Par. 29) is the first instance in which the administrative process is sustained by reliance on that disregard of law which enemies of the process have always alleged to be its principal evil. It is the first encouragement this Court has given to conscious lawlessness as a permissible rule of administrative action. This decision is an ominous one to those who believe that men should be governed by laws that they may ascertain and abide by, and which will guide the action of those in authority as well as of those who are subject to authority.[5]

I have long urged, and still believe, that the administrative process deserves fostering in our system as an expeditious and nontechnical method of *applying law* in special-

---

[4] *The Growth of the Law*, p. 3.

[5] On the same day, the Court denied its own authority to recognize and enforce, without Congressional action, an unlegislated liability much less novel than the one imposed here, and that in the field of tort law which traditionally has developed by decisional rather than by legislative process. The result is to confirm in an executive agency a discretion to act outside of established law that goes beyond any judicial discretion as well as beyond any legislative delegation. Compare *United States* v. *Standard Oil Co.*, 332 U. S. 301.

ized fields.[6] I can not agree that it be used, and I think its continued effectiveness is endangered when it is used, as a method of *dispensing with law* in those fields.

MR. JUSTICE FRANKFURTER joins in this opinion.

---

[6] See statement before House of Delegates, American Bar Association, 1939. (1939 Proceedings, House of Delegates, XXV A. B. A. Journal 95.) Also see Report as Attorney General to President Roosevelt recommending veto of Walter-Logan Bill—made part of veto message, Vol. 86, Part 12, Congressional Record, 76th Congress, 3d Session, p. 13943.