In the Matter of BERNARD ABRAMSON et al., on Behalf of Themselves and All Others Similarly Situated, Appellants, against COMMISSIONER OF EDUCATION OF THE STATE OF NEW YORK et al., Respondents.

Third Department, April 5, 1956.

*Jacob Greenwald* and *Morton H. Feder* for appellants.

*Charles A. Brind, Jr., John P. Jehu, Elizabeth M. Eastman* and *George B. Farrington* for Commissioner of Education of the State of New York, respondent.

*Peter Campbell Brown, Corporation Counsel (Peter J. Flanagan, Seymour B. Quel* and *Edward J. McLaughlin* of counsel), for Board of Examiners of the Board of Education of the City of New York and others, respondents.

HALPERN, J. The board of examiners of the board of education of the City of New York conducted an examination, over a period of several months in 1953 and 1954, for the position of assistant to the principal in the elementary schools. The examination was given in separate parts. The first part was a written examination, consisting of two sections, a short answer test held on November 3, 1953, and an essay test held on December 28 and 29, 1953. The written examination was taken by

1,241 candidates. Between the dates of the holding of the two sections of the written examination, on December 7, 1953, the board of examiners promulgated a passing mark of 65% for that examination. After the papers were graded, but before the candidates were identified and their respective grades ascertained, the board decided that the examination had been too difficult and that a passing grade of 65% would eliminate too large a proportion of the class. The board reached this conclusion after comparing the results of the examination with those of an examination which had been given in a prior year, to candidates who had had substantially the same training and experience. Accordingly, on March 5, 1954, the board voted to give a credit of 5% to each of the candidates. Thereafter, all persons who had passed the written test (under the revised marking), were admitted to the next phase of the examination, a supervision test. The candidates who had passed the written test were not advised of their precise grades, nor were they informed whether they had needed the additional 5% in order to attain a passing grade.

A number of candidates failed the supervision test and several more failed the next phase, the interview test. These candidates were informed of their failures on June 10, 1954, and October 13, 1954, respectively, and they were also advised of the fact that a 5% credit had been given to all candidates on the written test. Apparently, the candidates who had failed were also informed of their grades upon the written test, presumably so that they would have all relevant information in preparing any appeal which they might wish to take. An appeal was taken to the board of examiners by certain of the candidates who had failed the tests and, while the appeal was pending, an appeal was also taken to the Commissioner of Education. This appeal not only charged irregularities in connection with the tests which those appealing had failed but it also charged that the granting of the general 5% credit on the written test was improper, the appellants being candidates who had not needed the 5% credit to pass the written test.

The candidates who had passed the entire examination in all its phases and who were presumably to constitute the eligible list, 428 in number, were not advised of the precise grades which they had attained in the written test and therefore they did not know whether they had needed the 5% credit to attain a passing grade or not. The grades in all the phases of the examination had been averaged together, in accordance with a preannounced scale of weights for each phase, and it was the final grade which determined the candidate's rank on the eligibility list.

Sixty-four of the successful candidates intervened upon the appeal before the commissioner, in support of the integrity of the entire examination. They defended the regularity of the supervision and interview tests which were under attack and they also defended the propriety of the 5% credit on the written examination. However, they did not then know whether any of them had needed the 5% credit in order to become eligible to take the rest of the examination. As it turned out, many of them had not needed the 5% credit and it would have been to the advantage of those candidates if the 5% credit had not been given but, without knowing on which side of the controversy their own individual interest lay, all the intervenors defended the credit.

The Commissioner of Education dismissed the appeals of the candidates who had failed the supervision or interview tests insofar as they charged irregularities in those tests, on the ground that, since their appeals were still pending before the board of examiners, they had not exhausted their " administrative remedies ". However, he went on to hold that their objection to the 5% credit was well-founded and he directed the board of examiners to rescind the credit. This decision was of no immediate benefit to the candidates who had appealed to the commissioner, since their failures were not affected by the commissioner's decision. The decision, however, had a serious effect upon many candidates who had attained a passing grade in the written test only with the aid of the 5% credit and who had gone on to pass the remaining phases of the examination. The identity of these candidates was not known at the time of the decision. The commissioner's decision was handed down January 19, 1955. Within a few weeks thereafter, on February 18, 1955, the board of examiners and the intervenors and many other candidates moved for a reopening of the appeal. In addition, the board asked for a clarification of the decision. It seems that the board had established a two-point zone for rereading of papers of those who had barely failed the test and it had accordingly reread the papers of those who had originally attained marks of 58% and 59% on the examination and who had been given marks of 63% and 64% by reason of the 5% credit. The board was uncertain whether it had the authority, under the commissioner's decision, to proceed to reread the papers of those who had originally attained marks of 63% and 64%, and whose papers it had not previously reread, because, with the 5% credit, they had all clearly passed.

For some unexplained reason, the commissioner did not decide the motions for reopening and for clarification until June 17,

1955, almost five months after the date of his original decision. He denied the motion to reopen but he granted the clarification requested by the board and he held that the board had the right to reread the papers within the two-point zone under the marks as now restored to their original status.

This task presumably took the board some time and the identification of the names of the candidates affected by the commissioner's decision, after the final rereading, also took some time and it was not until June 29, 1955, that the board notified the candidates who had been successful in all the succeeding tests, but who had attained grades of only 60% to 64% in the written test and whose grades had not been materially improved upon the rereading, that, under the commissioner's decision, they had failed the written test and would be eliminated from the eligible list. There were in all 102 candidates who were thus removed from the eligible list. Within three weeks thereafter, on July 18, 1955, this proceeding was instituted by an order to show cause procured by 63 of the candidates so removed. Of these candidates, 13 had been among the 64 candidates who had intervened as respondents in the appeal before the commissioner; 50 had not intervened upon that appeal but, of this number, 19 had joined in the unsuccessful motion for reopening.

This proceeding was brought under article 78 of the Civil Practice Act against the commissioner and also against the board of examiners of the board of education, the board of education and the superintendent of schools of the City of New York. Only the commissioner interposed an answer. He set up the four-month Statute of Limitations (Civ. Prac. Act, § 1286) as an objection in point of law to the maintenance of the proceeding. The Special Term sustained this objection and dismissed the proceeding. The appeal to this court followed.

We do not believe that the four-month statute barred the proceeding. The commissioner's order did not become "final and binding", in the words of section 1286, until the persons whose names were to be eliminated from the eligible list were ascertained. Until that time, it was an abstract decision, a declaration of principle, still to be implemented. The implementation of the decision was left to the board of examiners. The board had to reread many papers which fell within the two-point zone and then it had to make public the identity of the candidates who had failed to attain 65% on the written test, after the rereading, and without the addition of the 5% credit. Until the board did that, the commissioner's order was like a judgment with a blank for the names of the persons against whom it ran. Until the blank was filled in, the order was incom-

plete. It did not become a complete, final and binding order until the names of the candidates affected by it were ascertained and announced by the board.

The four-month period could not run against any person affected by the order until he had notice that an order affecting him had been issued. The petitioners (even the 13 who had been intervenors upon the original appeal and the additional 19 who had joined in the motion for reargument) did not have notice of an order affecting them until they were notified by the board of examiners that they had failed the written test, by reason of the annulment of the 5% credit. This took place on June 29, 1955, and this proceeding was brought within less than one month thereafter. Presumably, the petitioners knew of the commissioner's action in January but, apart from the fact that they were awaiting action by him on the motion for reargument and clarification, they had no reason to institute a judicial proceeding to challenge his decision until they knew that they were aggrieved by it. It has been repeatedly held that the four-month period runs, not from the date of the order, but from the date when notice of it is given to the person affected (*People ex rel. Lahey* v. *Woodbury,* 102 App. Div. 333; *Matter of Soffer* v. *Macduff,* 205 Misc. 972; *Matter of R. E. Associates* v. *McGoldrick,* 278 App. Div. 347; *People ex rel. Anthony* v. *Graves,* 244 App. Div. 860). We therefore hold that this proceeding was brought in time.

Upon this appeal, the commissioner questions the right of the petitioners who had not intervened in the proceeding before him to maintain this proceeding to review his order. In view of the holding that the proceeding had been brought in time by the petitioners who had intervened before the commissioner, the question of the right of others to challenge his order is not of practical importance. If any of the petitioners succeed in this proceeding, any order which may be entered will enure to the benefit of all the candidates who were removed from the eligible list. Candidates who had not intervened before the commissioner may be heard as *amici curiæ* or may possibly be allowed to intervene in the judicial proceeding as persons having an interest in it (cf. *Donato* v. *American Locomotive Co.,* 283 App. Div. 410, 416, affd. 306 N. Y. 966, and Civ. Prac. Act, § 193-b).

However, we do not believe that the candidates who had not appeared before the commissioner have to rely upon their being admitted into the proceeding brought by their colleagues, as a matter of grace. We believe that they have independent standing to challenge the commissioner's order. As to them,

the commissioner's order was not a quasi-judicial order, issued after a hearing, but was an administrative order issued without hearing. From their standpoint, this proceeding is one in the nature of mandamus rather than certiorari. When the allowance of the 5% credit was attacked before the commissioner, he was not required by law to give notice to all candidates who might be adversely affected by a decision annulling the credit. There is no requirement of an administrative hearing with respect to controversies relating to examinations for appointment in the public service, in the absence of a statutory provision therefor (*Matter of Hecht* v. *Monaghan*, 307 N. Y. 461, 468). But any candidate who is removed from an eligible list as the result of an administrative order which, as to him, was issued without hearing, has the right to challenge the validity of the order by a proceeding in the nature of mandamus (*Matter of Kaney* v. *New York State Civil Service Comm.*, 190 Misc. 944, affd. 273 App. Div. 1054, affd. 298 N. Y. 707; *Matter of Ebling* v. *New York State Civil Service Comm.*, 305 N. Y. 221).

We therefore proceed to a consideration of the merits of the controversy.

If the commissioner's decision annulling the 5% credit had been made as a matter of educational policy, his decision would be " final and conclusive " (Education Law, § 310), in the absence of a finding that it was arbitrary or capricious. However, the commissioner did not base his decision upon educational policy or examination theory. He did not reach the question of policy because he felt that his action was mandated by the provisions of the New York State Constitution requiring all civil service examinations, as far as practicable, to be competitive (N. Y. Const., art. V, § 6). The commissioner held that " the lowering of the previously announced pass mark after the marking of the written test in the instant examination, which, as indicated, consisted of a series of tests, was in definite violation of the constitutional mandate of competitiveness ".

We do not believe that the New York State Constitution prohibited the board of examiners from adopting the examination procedure which it used here. There is nothing in the Constitution which prohibits an examining board from lowering the pass mark for the whole class if it determines in good faith, after an examination has been given, that it was too difficult and that the previously announced pass mark should not be adhered to. As a matter of fact, the Commissioner of Education recognized that this would have been sound and permissible practice if the examination had consisted only of a single test. (Cf. *Matter of Brady* v. *Finegan*, 269 N. Y. 571, affg. 246 App. Div.

526, and *Matter of Sullivan* v. *Taylor*, 309 N. Y. 927, affg. 285 App. Div. 638.) But he took the view that, since the examination was a multiple phase examination and the passing of the first part was a condition precedent to the candidate's being allowed to take the other parts, it was not permissible for the board of examiners to allow a uniform credit to all candidates or to lower the pass mark for the first part of the examination after that part had been given. The commissioner reasoned that this was improper because it enabled candidates who would otherwise have failed the first phase of the examination to continue in the remaining phases with the possibility of their attaining higher final average grades than those attained by candidates who had passed the first phase without the aid of the credit. The risk referred to by the commissioner was undoubtedly present but this did not mean that there was something wrong in the board's action. It simply meant that there was a possibility that candidates who had received marks of 60% to 64% on the written test might turn out to be superior, on the basis of the whole examination, to candidates who had attained 65% or more on the written test. The existence of this possibility did not justify the commissioner's holding that the board of examiners had no power under the Constitution to rectify the error of having given a written test which was later found to be too difficult.

The procedure adopted by the board did not, in our opinion, violate the constitutional principle of competitiveness. The examination was still competitive, the final results depending upon the weighted average of all the grades attained. The relative ranking of the candidates upon the final eligible list was not affected by the 5% credit since the same credit had been given to all the candidates.

The action of the board was wholly consistent with the letter and spirit of the constitutional provision that appointments in the civil service " shall be made according to merit and fitness to be ascertained, as far as practicable, by examination which, as far as practicable, shall be competitive " (N. Y. Const., art. V, § 6). In allowing the 5% credit, the board adopted a practical method of compensating for the excessive difficulty of the written test. It thus gave candidates who had attained grades of 60% to 64% but who, in the judgment of the board, were entitled to passing grades in the written test, an opportunity to go on to demonstrate their merit and fitness in the rest of the examination.

There is no constitutional mandate that, in a multiple phase examination, the passing of the first phase of the examination

must be made a "hurdle", which must be overcome in order to make the candidate eligible to take the rest of the examination. Multiple phase examinations may constitutionally be given, and frequently are given, without making any part of the examination a "hurdle"; one who does poorly in one part may nevertheless win a place on the eligible list if he attains a passing grade on the whole examination (cf. *Matter of Dowling* v. *Brennan,* 284 App. Div. 563). No constitutional principle was violated by the board in this case by its action in lowering the "hurdle", after the written examination had been given, and in accordingly allowing candidates whom it believed to be fit and qualified, to go on to the other phases of the examination.

It is thus apparent that the commissioner misapprehended the effect of the constitutional mandate that examinations "as far as practicable * * * shall be competitive". The commissioner having decided the proceeding before him under a misapprehension as to the impact of the Constitution upon the problem, his decision should be annulled and the matter should be remitted to him for a new determination, free of the erroneous view as to the meaning of the Constitution which had influenced his decision (cf. *Securities Comm.* v. *Chenery Corp.,* 318 U. S. 80, 332 U. S. 194). We reiterate that we do not hold that the commissioner may not annul the 5% credit, if he believes that the granting of such a credit was unwise or undesirable as a matter of educational policy. We merely hold that he was not required, by any mandate of the Constitution, to take that action.

The order appealed from should be reversed and the motion to dismiss the petition should be denied and the order of the commissioner should be annulled and the matter remitted to him for further proceedings, with costs to the appellants.

FOSTER, P. J., BERGAN, COON and ZELLER, JJ., concur.

Order appealed from reversed and the motion to dismiss the petition denied and the order of the commissioner annulled and the matter remitted to him for further proceedings, with $50 costs to the appellants.