590 F.2d 1062
 191 U.S.App.D.C. 360, 4 Media L. Rep. 1410
 OFFICE OF COMMUNICATION OF the UNITED CHURCH OF CHRIST, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
Radio Television News Directors Assn., Public Broadcasting
Service, CBS, Inc., ABC, Inc., NBC, Inc., the
National Association of Broadcasters,
and Delaware Broadcasting Co.,
Intervenors.
 No. 76-1878.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Oct. 19, 1977.
Decided Sept. 11, 1978.
As Amended Sept. 19, 1978.
 
 Carol J. Jennings, Washington, D. C., with whom Harvey J. Shulman, Washington, D. C., was on brief, Collot Guerard, Washington, D. C., for petitioner.
 Stephen A. Sharp, Atty., F. C. C., Washington, D. C., for respondent. Werner K. Hartenberger, Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, Raymond L. Strassburger, Counsel, F. C. C., B. Barry Grossman and James F. Ponsoldt, Attys., Dept. of Justice, Washington, D. C., were on brief, Gregory M. Christopher, Atty., F. C. C., Washington, D. C., for respondent.
 
 
 1
 Theodore D. Frank, Washington, D. C., with whom Harry M. Plotkin, Alan Auckenthaler, James A. McKenna, Jr., Carl R. Ramey, J. Roger Wollenberg, John H. Harwood, II, Erwin G. Krasnow, Washington, D. C., Bernard G. Segal, Jerome J. Shestack, Denna Schneider, Philadelphia, Pa., Elizabeth L. Shriver and Howard Monderer, Washington, D. C., were on brief, for intervenors, American Broadcasting Companies, et al.
 
 
 2
 J. Laurent Scharff, Washington, D. C., was on brief, for intervenor, Radio Television News Directors Assn.
 
 
 3
 Barry O. Chase, Washington, D. C., for intervenor, Public Broadcasting Service.
 
 
 4
 Timothy B. Dyk, Washington, D. C., for intervenor, CBS.
 
 
 5
 Frederick H. Walton, Jr. and John J. Dempsey, Washington, D. C., for intervenor, Delaware Broadcasting Co.
 
 
 6
 Before WRIGHT, Chief Judge, BAZELON and ROBB, Circuit Judges.
 
 
 7
 Opinion for the Court filed by BAZELON, Circuit Judge.
 
 BAZELON, Circuit Judge:
 
 8
 Petitioner, the Office of Communication of the United Church of Christ (UCC), an intervenor in proceedings before the Federal Communications Commission (FCC), seeks review of the Commission's latest expansion of the "on-the-spot" exemption to the equal opportunities provision of the Communications Act of 1934, 47 U.S.C. § 315(a)(4) (1970).[1] Until 1975, the Commission had insisted that broadcasters could not provide on-the-spot coverage of public appearances by candidates without incurring an obligation to offer equal time to other legally qualified candidates for the same office.[2] Thereafter, the Commission removed the obligation with respect to Live broadcasts of newsworthy political events.[3] In the case under review here, the FCC has lifted that obligation for delayed broadcasts of "bona-fide news events" involving political candidates.
 
 
 9
 On July 19, 1976, radio station WILM of Wilmington, Delaware, informed the FCC that it planned to record a public debate between Republican and Democratic congressional candidates for broadcast "the evening of the same day or three days later." Delaware Broadcasting Co., 60 F.C.C.2d 1030, 1030 (1976). The Commission's Broadcast Bureau ruled that such taped broadcast would create "an obligation by the licensee to afford 'equal opportunities' to all legally qualified candidates for the office in question." Id. at 1031. The Commission, however, citing the need to preserve "considerable discretion in the presentation of news programming," reversed the Broadcast Bureau.[4] The FCC opinion stressed the broadcaster's responsibility to judge whether delayed broadcast of such a public event would be justified by the event's "current newsworthiness." The FCC stated that length of delay would be "a factor in determining the broadcaster's reasonableness and good faith," adding, "absent unusual circumstances, a delay of more than a day would raise questions" as to the broadcast's eligibility for a § 315(a)(4) exemption. Id. at 1032-33.
 
 
 10
 Petitioner, in challenging the FCC decision, contends that the Commission erred (I) in interpreting the "on-the-spot" exemption to cover the broadcast of taped political events; and (II) in adopting this interpretation in an adjudication of a particular case rather than in a rulemaking proceeding with provision for notice and comment. We affirm the FCC's decision against both claims.
 
 I. THE CONSTRUCTION OF § 315(a)(4)
 A. The Statute
 
 11
 Section 315(a) establishes four exemptions to the equal opportunities requirement, determined according to type of news coverage: (1) regularly scheduled newscasts, (2) news interview shows, (3) news documentaries, and (4) on-the-spot coverage of news events.[5] By modifying all four categories with the phrase "bona fide," Congress plainly emphasized its reliance on newsworthiness as the basis for an exemption.
 
 
 12
 Section 315(a)(4) exempts a broadcast licensee from an equal time obligation if any candidates appear in "on-the-spot coverage of bona fide news events (including but not limited to political conventions and activities incidental thereto)." 47 U.S.C. § 315(a)(4) (1970). The central ambiguity in the provision is the meaning of the phrase "on-the-spot." Petitioner insists that the term refers to events broadcast "as they happen, i. e., on the spot." Reply Brief of Petitioner, at 9. Respondents, citing submissions by intervenors from the broadcast industry, contend that the phrase is a "term of art" in the industry that refers "primarily to the location of the news coverage rather than to the time it was broadcast." Brief for Respondents, at 7. This view contrasts on-the-spot coverage with in-studio broadcasts, and suggests that there is no temporal content to the statutory phrase.[6] Although the FCC did not directly address the precise meaning of the term in the decision under review here, in a subsequent case the Commission held that the language refers to "contemporary, if not simultaneous, broadcast" of news events. John F. Donato, 66 F.C.C.2d 599, 601 (1977). This interpretation underlies the Commission's view that broadcasts delayed up to one day are presumptively exempt from the equal opportunities obligation, but that longer delays are less likely to qualify for the exemption.[7]
 
 
 13
 Some light is shed on the meaning of the phrase "on-the-spot coverage" by the statute's use of political conventions as a paradigm for such coverage, and by the shared characteristics of the parallel exemptions granted in § 315(a).[8]
 
 
 14
 The exemption in question developed in some measure from a congressional desire to protect news coverage of national political conventions from the equal time doctrine.[9] That Congress intended the exemption to reach more broadly, however, is clear from its inclusion of news events other than conventions.[10] Although much convention coverage is ordinarily presented live, the use of taped or filmed segments on such broadcasts is common, suggesting that on-the-spot coverage is not necessarily limited to live broadcast.
 
 
 15
 In addition, the other exempt news shows regular newscasts, documentaries, and news interviews make liberal use of previously recorded material. Admittedly, the term "on-the-spot" connotes an element of timeliness or newsworthiness. Nevertheless, it seems most unlikely that, in the absence of more specific language, Congress would have singled out on-the-spot coverage for a complete prohibition on the use of taped material. Since distorted treatment of candidates is equally possible in all four categories of exemptions, congressional concern that broadcasters might play favorites among political candidates provides no basis for distinguishing on-the-spot coverage from the other three categories.[11]
 
 B. The Legislative History
 
 16
 The exemptions to § 315's requirement of equal broadcast opportunities were enacted in 1959, immediately following a controversial FCC decision requiring broadcasters to provide equal time if a regular newscast contained coverage of a political candidate.[12] The purpose of the legislative action, taken before court review of the FCC decision,[13] was to reverse the Commission's construction of the equal opportunities requirement.[14] Congress feared that the Commission policy would deter broadcast licensees from covering political news by inspiring "a parade of aspirants" to seek free air time following any coverage of political campaigns.[15]
 
 
 17
 Under the 1959 Amendments, the equal opportunities doctrine was tempered by the conviction that broadcasters should have greater freedom to perform their professional function of informing the public on current issues.
 
 
 18
 Thus, it is necessary, in the public interest, to achieve a balance between substantial equality of opportunity of political candidates on the one hand, and the need, on the other hand, of broadcasters to be free from unreasonable restraints in the exercise of their news judgment insofar as the appearance of political candidates is concerned.
 
 
 19
 H.R.Rep.No. 802, 86th Cong., 1st Sess. 4-5 (1959).[16] The automatic equal time provision was supplanted by a legislative directive to balance the competing interests of equal treatment of candidates and full coverage of political questions. Congress recognized that striking a proper balance would be difficult, but insisted that "(t)he difficulties which lie in the path of achieving such a balance should not be magnified to an extent where either of these principles is lost sight of." Id. at 5.
 
 
 20
 The decision to favor political discussion was made despite Congressional fears that broadcasters might abuse their position by favoring particular candidates.[17] The Senate Report dealt directly with this problem. Arguing that "(t)he public should not be deprived of the benefits that flow from this dynamic form of communications during the critical times of a political campaign," the Report concluded, "The public benefits (of political news coverage) are so great that they outweigh the risk that may result from the favoritism that may be shown by some partisan broadcasters."[18]
 
 
 21
 Still, Congress was not resigned to unrestrained favoritism in the broadcast coverage of political campaigns when it amended § 315. In the first instance, it relied on the professional standards of journalistic integrity on "the maturity of our broadcasters" and their commitment "to serve the public interest."[19] Congress, however, also called upon the Commission to develop and enforce the policy articulated in the 1959 Amendments.
 
 
 22
 It is difficult to define with precision what is a newscast, news interview, news documentary, or on-the-spot coverage of news event or panel discussion. That is why the committee in adopting the language of the proposed legislation carefully gave the Federal Communications Commission full flexibility and complete discretion to examine the facts in each complaint . . .
 
 
 23
 . . . Based on (its expertise in broadcast regulation) and other information that it is in a position to develop, the Commission can set down some definite guidelines through rules and regulations and wherever possible by interpretations.[20]
 
 
 24
 By responding to particular complaints of unequal treatment, and by reviewing such complaints in license renewal proceedings, the FCC was to monitor broadcasting practices.[21] And the Senate Report took pains to point out the broadcasts qualifying for a § 315 exemption would still be subject to the Communication Act's "public interest" standard, and would have to provide fair and objective presentation of issues.[22]
 
 C. The FCC Did Not Exceed Its Authority
 
 25
 The foregoing discussion indicates both that the statute does not on its face preclude delayed broadcasts of political events and that it confers agency discretion to strike a balance between the rival interests of the equal opportunities provision and the exemptions to § 315.[23]
 
 
 26
 An agency's construction of open-ended provisions in its statute will prevail unless there are "compelling indications" that it has misconstrued the law.[24] If there is a "reasonable basis in law" and in the administrative record for the agency's position, a court will sustain that construction even though it is not "the only reasonable one, or . . . the result we would have reached had the question arisen in the first instance in judicial proceedings." Unemployment Commission v. Aragon, 329 U.S. 143, 153, 154, 67 S.Ct. 245, 91 L.Ed. 136 (1946).[25] Our task is not to evaluate the merits of the Commission's policy choice, but only to assure ourselves that agency action is consonant with congressional directives. This principle applies equally where, as here, we review modification of a previous policy.[26]
 
 
 27
 The agency, however, must provide a reasoned basis for its action, fully explaining the course it has taken in light of relevant legal and policy issues.[27] Here, the Commission satisfied this requirement. Its view of the legislative history of the 1959 Amendments and its discretion thereunder is described in the opinion. Delaware Broadcasting Co., supra, at 1031. After asserting that it could see "no valid reason" for distinguishing the facts in Chisholm from the delayed broadcast involved here, the FCC emphasized that broadcast coverage of political news should "reach the individual so as to permit reasonable opportunity to evaluate legally qualified candidates for public office . . . " Id. at 1032. To that end, the agency cited the need to grant broadcasters substantial discretion in determining on-the-spot political coverage. The Commission also noted that some flexibility in broadcast time is warranted to accommodate scheduling problems, particularly when a news event is broadcast across several time zones, and to deal with special concerns such as captioning for deaf viewers and delayed transmission for broadcasters with daytime-only licenses. Id. at 1032 n.8.[28]
 
 
 28
 Nor can we agree that the Commission overstepped its legal powers in dealing with this difficult problem. By revising its interpretation of § 315(a)(4), the FCC attempted to reconcile the arguably contradictory currents within the statute. The concern in the original provision for fairness to candidates confronts the congressional desire, expressed in the 1959 Amendments, to encourage coverage of political campaigns by broadcast licensees.[29] When such important interests must be balanced, there can be no simple, clear resolution of the matter. The range of interpretations of the on-the-spot coverage provision amply illustrated by the FCC's shifting view of it reflects the tensions within the statute.[30] Although that range is not unlimited, we cannot find that the Commission has exceeded its delegated authority.II. ADJUDICATION V. RULE-MAKING
 
 
 29
 In Chisholm v. FCC, supra, this court rejected the contention that the Commission improperly used an adjudicative proceeding to expand its interpretation of § 315(a)(4). The ruling in Chisholm, which involved a more drastic shift of FCC policy than that before us in this case, was based on the proposition that, absent a demonstration of abuse of discretion, an agency can reasonably determine whether to proceed by rulemaking or adjudication. 176 U.S.App.D.C. at 16, 538 F.2d at 364-65.[31]
 
 
 30
 In ratifying the use of an adjudicative proceeding, the Chisholm court stressed that the Commission provided a reasoned opinion explaining its action, and that interested groups who were not parties to the proceeding had an opportunity to comment on the matter before the agency. 176 U.S.App.D.C. at 15, 538 F.2d at 365. Both criteria are satisfied in this case. As discussed above, the FCC's opinion presented a sound analysis of the issues involved, satisfying the requirement of the Administrative Procedure Act that agency action not be arbitrary or capricious. 5 U.S.C. § 706(2)(A) (1976). In addition, there were seven intervenors, including petitioner, in the Commission's proceeding, providing some assurance that there was an extensive discussion of the issues before the Commission.[32] Indeed, the instant case may present an even stronger basis for acting through adjudication since, unlike Chisholm, the Commission here reviewed specific facts involving an attempt to provide on-the-spot news coverage. As the FCC's earlier rulings did not reach the question of delayed broadcasts under the on-the-spot exemption, adjudication of that issue was appropriate.[33]
 
 Accordingly, the Commission's order is
 
 31
 Affirmed.
 
 
 
 [1]
 For the text of the statute, see note 5 Infra
 
 
 [2]
 National Broadcasting Co. (Wyckoff), 40 F.C.C. 370 (1962); The Goodwill Station, Inc., 40 F.C.C. 362 (1962)
 
 
 [3]
 Aspen Institute, 55 F.C.C.2d 697 (1975), Aff'd sub nom. Chisholm v. F. C. C., 176 U.S.App.D.C. 1, 538 F.2d 349, Cert. denied, 429 U.S. 890, 97 S.Ct. 247, 50 L.Ed.2d 173 (1976)
 
 
 [4]
 Delaware Broadcasting Co., 60 F.C.C.2d 1030, 1032 (1976). The FCC held:
 Upon further consideration, we believe that, consistent with the statutory scheme and purpose as manifested in the language of Section 315 and in the broad mandate contained in its legislative history, there is no valid reason to deny an exemption to a broadcast which would otherwise be exempt if not for its delayed basis.
 
 
 [5]
 Section 315(a) provides
 (a) If any licensee shall permit any person who is a legally qualified candidate for any public office to use a broadcasting station, he shall afford equal opportunities to all other such candidates for that office in the use of such broadcasting station: Provided, That such licensee shall have no power of censorship over the material broadcast under the provisions of this section. No obligation is imposed upon any licensee to allow the use of its station by any such candidate. Appearance by a legally qualified candidate on any
 (1) bona fide newscast,
 (2) bona fide news interview,
 (3) bona fide news documentary (if the appearance of the candidate is incidental to the presentation of the subject or subjects covered by the news documentary), or
 (4) on-the-spot coverage of bona fide news events (including but not limited to political conventions and activities incidental thereto),
 shall not be deemed to be use of a broadcasting station within the meaning of this subsection. Nothing in the foregoing sentence shall be construed as relieving broadcasters, in connection with the presentation of newscasts, news interviews, news documentaries, and on-the-spot coverage of news events, from the obligation imposed upon them under this chapter to operate in the public interest and to afford reasonable opportunity for the discussion of conflicting views on issues of public importance.
 
 
 [6]
 Like the opposing constructions of the provision, this position finds scant support in the legislative history. The only instance cited by respondents is a reference by Rep. Moss in floor debate on a related issue to "taped on-the-spot coverage" of news events. 105 Cong.Rec. 16243 (1959) (remarks of Rep. Moss)
 
 
 [7]
 Delaware Broadcasting Co., Supra, at 1032-33; John F. Donato, 66 F.C.C.2d 599, 601 (1977)
 
 
 [8]
 Petitioner's brief points out that in its Aspen decision the FCC restricted its holding to the facts of National Broadcasting Co. (Wyckoff), supra, and The Goodwill Station, Inc., supra, both of which involved live broadcasts. Brief for Petitioner, at 7. Naturally the review in this court was confined to the situations presented in those cases. Chisholm v. FCC, 176 U.S.App.D.C. 1, 8, 538 F.2d 349, 356 (1976). That a prior ruling covered different facts could hardly bar the Commission, or this court, from applying the exemptions of the statute to other situations in appropriate subsequent actions
 
 
 [9]
 See H.R.Rep.No. 802, 86th Cong., 1st Sess. 6 (1959) (on-the-spot coverage of political conventions "one of the outstanding achievements of radio and television")
 
 
 [10]
 See id. at 7 (discussing "on-the-spot coverage of news events other than conventions")
 
 
 [11]
 During the Senate hearings on the 1959 Amendments to § 315, Edward W. Barrett, dean of the Columbia Journalism School, emphasized the possibilities of unfairness even if equal time is granted. "If (a broadcaster) were intent upon distortion," Barrett said, "he could so select his quotations, his comments, and his television film shots to lionize the one and slaughter the other." Political Broadcasting: Hearings Before the Communications Subcomm. of the Senate Comm. on Interstate and Foreign Commerce, 86th Cong., 1st Sess. 242 (1959) (hereinafter cited as Senate Hearings)
 
 
 [12]
 S.Rep.No. 562, 86th Cong., 1st Sess. 4-5, 8-9 (1959); H.R.Rep.No. 802, Supra note 9, at 2-4, U.S.Code Cong. & Admin.News 1959, p. 2564. In Columbia Broadcasting System, Inc. (Lar Daly), 18 Rad.Reg. (P & F) 238, Reconsideration denied, 26 F.C.C. 715 (1959), the FCC held that the appearance of Any candidate on a television news program gave rise to an obligation to provide equal time to legally qualified opposition candidates. Three days later hearings began on amendments to § 315, and the amendments were enacted within three months of the Lar Daly decision. Pub.L.No. 86-274, 73 Stat. 557. See Senate Hearings, Supra note 11
 
 
 [13]
 See H.R.Rep.No. 802, Supra note 9, at 4 ("time is of the essence, and legislation should be enacted promptly")
 
 
 [14]
 See id.; S.Rep.No. 562, Supra note 12, at 9-10
 
 
 [15]
 S.Rep.No. 562, Supra note 12, at 9. The Senate Report suggested that this situation "would tend to dry up meaningful radio and television coverage of political campaigns." Id. at 10, U.S.Code Cong. & Admin.News 1959, p. 2572. See H.R.Rep.No. 802, Supra note 9, at 4; 105 Cong.Rec. 14447 (1959) (remarks of Sen. Hartke) (rather than comply with Lar Daly Decision, broadcasters were "blacking out" political coverage); 105 Cong.Rec. 14451 (1959) (remarks of Sen. Holland) (goal of amendments is that broadcasters "cover the political news to the fullest degree")
 
 
 [16]
 See also 105 Cong.Rec. 14445 (1959) (remarks of Sen. Pastore); Id. at 14446 (remarks of Sen. McNamara)
 
 
 [17]
 H.R.Rep.No. 802, Supra note 9, at 7 (in on-the-spot coverage of news events "(t)he opportunities for favoritism and discriminations are many and may be important to the political fortunes of the candidates involved")
 
 
 [18]
 S.Rep.No. 562, Supra note 12, at 10 (1959), U.S.Code Cong. & Admin.News 1959, p. 2572. In Columbia Broadcasting System, Inc. v. Democratic National Committee, 412 U.S. 94, 124-25, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973), Chief Justice Burger expressed the legislative policy toward broadcast regulation in similar terms:
 For better or worse, editing is what editors are for; and editing is selection and choice of material. That editors newspaper or broadcast can and do abuse this power is beyond doubt, but that is no reason to deny the discretion Congress provided. Calculated risks of abuse are taken in order to preserve higher values.
 
 
 [19]
 S.Rep.No. 562, Supra note 12, at 14
 
 
 [20]
 Id. at 12, U.S.Code Cong. & Admin.News 1959, p. 2574. See also 105 Cong.Rec. 14456 (1959) (remarks of Sen. Pastore)
 This particular reliance on the FCC to use its discretion in the application of the equal opportunities principle is also evident in § 315(d). 47 U.S.C. § 315(d) (Supp. V 1975). Even though another section of the Communications Act gives the agency general rulemaking powers, 47 U.S.C. § 303(r) (1970), this provision authorizes the Commission to "prescribe appropriate rules and regulations to carry out the provisions of this section."
 
 
 [21]
 H.R.Rep.No. 802, Supra note 9, at 11-12; S.Rep.No. 562, Supra note 12, at 12. In addition, 1972 amendments to the Communications Act provide that the Commission may revoke a station license "for willful or repeated failure to allow reasonable access to . . . a broadcasting station by a legally qualified candidate for Federal elective office on behalf of his candidacy." 47 U.S.C. § 312(a)(7) (Supp. V 1975)
 
 
 [22]
 S.Rep.No. 562, supra note 12, at 13, U.S.Code Cong. & Admin.News 1959, p. 2575:
 The Committee desires to make it crystal clear that the discretion provided by this legislation shall not exempt licensees . . . from objective presentation (of the news) in the public interest.
 
 
 [23]
 In Thomas R. Fadell, 40 F.C.C. 379, Aff'd per curiam sub nom. Fadell v. FCC, 25 Rad.Reg. (P & F) 2063 (7th Cir. 1963), the Commission approved the taped broadcast of coverage of a county court session in Gary, Indiana. Although the FCC found that such coverage fell within the § 315(a)(4) exemption, the case is not a strong precedent for the situation before us. The complaint in Fadell charged that the program violated § 315 because the judge of the court was a candidate for election to another office. The FCC ruled that since the judge had appeared on the show for the preceding seven years, the broadcast was on-the-spot coverage of a "bona fide" news event. The question of delayed broadcast was never considered explicitly
 
 
 [24]
 Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 381, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969). See NLRB v. Hearst Publications, Inc., 322 U.S. 111, 131, 64 S.Ct. 851, 88 L.Ed. 1170 (1944); Chisholm v. FCC, supra, 176 U.S.App.D.C. at 8-10, 538 F.2d at 356-58
 
 
 [25]
 See also Volkswagenwerk Aktiengesellschaft v. Federal Maritime Commission, 390 U.S. 261, 272, 88 S.Ct. 929, 19 L.Ed.2d 1090 (1968); Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); Philadelphia Television Broadcasting Co. v. FCC, 123 U.S.App.D.C. 298, 299-300, 359 F.2d 282, 283-84 (1966); National Broadcasting Co. v. FCC, 170 U.S.App.D.C. 173, 243, 516 F.2d 1101, 1171 (1975) (Bazelon, C. J., dissenting)
 
 
 [26]
 "An administrative agency concerned with furtherance of the public interest is not bound to rigid adherence to precedent. It may switch rather than fight the lessons of experience." New Castle County Airport Comm'n v. CAB, 125 U.S.App.D.C. 268, 270, 371 F.2d 733, 735 (1966), Cert. denied sub nom. Board of Transp. v. CAB 387 U.S. 930, 87 S.Ct. 2052, 18 L.Ed.2d 991 (1967) (footnote omitted)
 
 
 [27]
 As this court stated in Chisholm v. FCC, supra, 176 U.S.App.D.C. at 16, 538 F.2d at 364, the agency must offer " 'an opinion or analysis indicating that the standard is being changed and not ignored, and assuring that it is faithful and not indifferent to the rule of law' " (quoting Columbia Broadcasting System, Inc. v. FCC, 147 U.S.App.D.C. 175, 183, 454 F.2d 1018, 1026 (1971)). See Environmental Defense Fund v. EPA, 150 U.S.App.D.C. 348, 359, 465 F.2d 528, 539 (1972); New Castle County Airport Comm'n v. CAB, supra, 125 U.S.App.D.C. at 270, 371 F.2d at 735
 
 
 [28]
 In recent years delayed broadcasts of news events such as congressional hearings have found a wide audience among those who work during the day and are unable to view the program unless it is shown on a delayed basis. The public interest has certainly been served by such taped rebroadcasts. See J.A. 52 (list of over thirty news events broadcast on a delayed basis by the Public Broadcasting Service from 1972 to 1975)
 
 
 [29]
 See Chisholm v. FCC, supra, 176 U.S.App.D.C. at 12, 538 F.2d at 360
 
 
 [30]
 The Commission's present view of the exemption may be seen as part of the rising tide of deregulation that has washed away much public support for government restrictions on private activity. Examples of this trend within the communications area, in addition to the FCC's actions in Aspen and Delaware Broadcasting, are numerous. After this case was argued, the Commission restricted the definition of "legally qualified candidate" and thereby limited the number of candidates who might qualify for equal access under section 315(a). In the same order, the Commission also reduced the period before a nominating procedure during which a candidate could claim equal time. 43 Fed.Reg. 32,790-97 (July 28, 1978). Pending legislation in Congress would further reduce the FCC's regulatory role. See H.R. 13015, 95th Cong., 2d Sess. (1978). Cf. Midwest Video Corp. v. FCC 571 F.2d 1025 (8th Cir. 1978) (denying FCC jurisdiction to require cable television systems to maintain channels for free use by public bodies)
 
 
 [31]
 See NLRB v. Bell Aerospace Corp., 416 U.S. 267, 294, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974); SEC v. Chenery Corp., 332 U.S. 194, 202-03, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947)
 
 
 [32]
 In addition to the Office of Communication of the United Church of Christ, the intervenors included the Public Broadcasting Service, the American Broadcasting Companies, CBS, Inc., the National Association of Broadcasters, the National Broadcasting Company, and the Radio Television News Directors Association
 
 
 [33]
 In affirming the Commission in this case we note that, in addition to the "reasonableness and good faith" standard for evaluating compliance with § 315, 60 F.C.C.2d at 1032; John F. Donato, Supra, at 601, the broadcast delay recognized under the § 315(a)(4) exemption is basically limited to 24 hours. Moreover, it should be noted that the purpose of § 315(a)(4) is to permit broadcast of those events not suitable for coverage in excerpted form in regularly scheduled broadcasts. Consequently, delayed airing of excerpts of "on-the-spot coverage of bona fide news events" would blur the distinction between § 315(a)(4) and the § 315(a)(1) exemption for newscasts, and, more important, would further increase the licensee's opportunity for favoritism with respect to political candidates for the same office