617 F.2d 809
 199 U.S.App.D.C. 227
 FLORIDA POWER & LIGHT COMPANY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
City of Homestead, Florida, Intervenor.
FLORIDA POWER & LIGHT COMPANY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Lake Worth Utilities Authority of Lake Worth, Florida, Intervenor.
FLORIDA POWER & LIGHT COMPANY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent.
 Nos. 78-1884, 78-2249, 78-2302 and 79-1260.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Oct. 24, 1979.
Decided Jan. 24, 1980.
 
 [199 U.S.App.D.C. 229] Petitions for Review of an Order of the Federal Energy Regulatory commission.
 Robert T. Hall, III, Washington, D. C., with whom Richard M. Merriman, Floyd L. Norton, IV, and John R. Schaefgen, Jr., Washington, D. C., were on the brief, for petitioner.
 Andrew M. Zack, Washington, D. C., Atty., with whom Robert R. Nordhaus, Gen. Counsel, and Howard E. Shapiro, Sol., Federal Energy Regulatory Commission, Washington, D. C., were on the brief, for respondent.
 Robert A. Jablon, Washington, D. C., with whom Daniel J. Guttman, Washington, D. C., was on the brief, for intervenors.
 Harry A. Poth, Jr. and Robert S. Medvecky, Washington, D. C., also entered appearances for petitioner.
 Lynn N. Hargis, Atty., Federal Energy Regulatory Commission, Washington, D. C., also entered an appearance for respondent.
 Before J. EDWARD LUMBARD,* Senior Circuit Judge for the Second Circuit, and TAMM and MIKVA, Circuit Judges.
 Opinion for the court filed by Senior Circuit Judge LUMBARD.
 Opinion concurring in part and dissenting in part filed by Circuit Judge TAMM.
 LUMBARD, Circuit Judge:
 
 
 1
 Florida Power & Light (FPL) petitions this court for the review of five orders issued by the Federal Energy Regulatory Commission (FERC or Commission) in four dockets.[1] FPL argues that the Commission deviated from the guidelines of the Federal Power Act, 16 U.S.C. § 791a et seq., and from the prior interpretation of its own regulations, by classifying as "changed" rates, rather than as "initial" rates, the rate schedules FPL filed in each docket, and that the Commission exceeded its authority by issuing one of those orders after the statutory deadline for FERC action. We disagree.
 
 I.
 
 2
 Section 205(c) of the Federal Power Act, 16 U.S.C. § 824d(c), requires that public utilities file with the Commission the [199 U.S.App.D.C. 230] rate schedule for each agreement to provide a service which is subject to the Commission's jurisdiction. If the Commission finds that any filed rate is "unjust, unreasonable, unduly discriminatory or preferential," § 206(a) of the Act, 16 U.S.C. § 824e(a), dictates that the Commission shall determine the just and reasonable rate and shall fix that rate by order. Once a rate has been filed and has taken effect, the utility may not change it, according to § 205(d), 16 U.S.C. § 824d(d), except after thirty days notice to the Commission and the public. The utility gives such notice by filing with the Commission a new schedule "stating plainly the change or changes to be made in the schedule or schedules then in force." Whenever a utility files any such new schedule as described in § 205(d), the Commission has the authority, as set out in § 205(e), to conduct hearings concerning the lawfulness of the changed rate, to suspend the operation of the rate for up to five months, and, if it allows the rate to take effect before the hearings conclude, to order the utility to refund any portion of an increase in rates which the utility cannot show to be just and reasonable. Thus, the Act empowers the Commission to scrutinize, and if necessary to change, any rate filed, whether it is a changed rate or the first rate a utility has ever filed. However, only if the filed rate is a changed rate may the Commission also suspend its operation or allow it into effect subject to refund.[2] It is the fact that the Commission has greater power over changed rates than it has over initial rates that lies at the heart of this suit.
 
 
 3
 Between October 1977 and July 1978, each of these four customers TECO and the three cities entered into numerous additional interchange agreements with each other and with other electric utilities.[3] [199 U.S.App.D.C. 231] Moreover, because not all of the parties to these additional interchange agreements are directly linked by electric wires, each of the four customers negotiated agreements with FPL, which has direct links to all the parties, for FPL to transmit through its wires the exchanged electricity. Pursuant to § 205(c), FPL filed with the Commission the rate schedules for each of these agreements known as transmission agreements.[4]
 
 
 4
 Before these transmission agreements took effect, FPL had only interchange agreements with these four customers, with the exception that it also had had a partial requirements (i. e. a wholesale) agreement with Homestead. Thus, on the theory that transmission service fundamentally differs from either interchange or requirements service, FPL filed its transmission rate schedules as "initial" rates. That term does not appear in the Federal Power Act, but is the label the Commission's regulations give to a schedule that does not change any rate then in force and that is therefore not subject to the Commission's suspension or refund powers under § 205(e). 18 C.F.R. § 35.1(b). The Commission disagreed with that classification, asserting that transmission service does not fundamentally differ from interchange or requirements service because FPL necessarily already transmits electricity to the four customers to execute the interchange and requirements agreements. Thus, the Commission decided, the transmission agreement schedules change or to use the language of the Commission's regulations, "supersede, supplement, cancel or otherwise change," 18 C.F.R. § 35.1(c) a rate then in force, that rate being the rate for transmission necessarily included in the interchange and requirements rate schedules.
 
 
 5
 Having classified the schedules as changed rather than initial rates, the Commission asserted its § 205(e) authority to suspend the rates for one day and then to put them into effect subject to refund if they are later found to be unjustified increases, and to order a hearing to determine their lawfulness. FPL sought a rehearing in each docket, as § 313(b), 16 U.S.C. § 825l (b), requires it to do before seeking review in a court of appeals. The Commission denied each request, with the exception that it granted a rehearing in the Vero Beach docket for the limited purpose of reconsideration. It later affirmed the denial. FPL filed timely petitions for review and the four dockets were consolidated for briefing and argument.
 
 II.
 
 6
 The Commission contends that these orders are not reviewable because the decision to suspend a filed schedule is a nonreviewable exercise of agency discretion. We can expeditiously dispose of this claim, which has been rejected by the Eighth Circuit, when it reviewed similar FERC orders in Otter Tail Power Company v. FERC, 583 F.2d 399 (8th Cir. 1978), and the Supreme Court, when it reviewed similar orders issued by the Interstate Commerce Commission in Trans Alaska Pipeline Rates Cases, 436 U.S. 631, 98 S.Ct. 2053, 56 L.Ed.2d 591 (1978). While the Commission's discretionary decision whether to suspend a rate is nonreviewable (see Municipal Light Board v. FPC, 146 U.S.App.D.C. 294, 304, 450 F.2d 1341, 1351 (D.C. Cir. 1971), cert. denied, 405 U.S. 989, 92 S.Ct. 1251, 31 L.Ed.2d 445 (1972)), the Commission has that power only if it has appropriately classified a schedule as a change in rates rather than initial rates. We may review these orders, therefore, to ascertain whether the Commission has exceeded its authority by suspending a rate inappropriately classified as a change.
 
 
 7
 We can also dispose of the Commission's claim that these orders, even if ultimately reviewable, are not presently reviewable because FPL has not yet been [199 U.S.App.D.C. 232] "aggrieved" by them as required by § 313(b) of the Act. No general rule dictates when a party is "aggrieved" within the meaning of the Federal Power Act and similar regulatory statutes. Rather, courts determine alleged aggrievance on the basis of the specific facts in each case. Northwestern Public Service Company v. FPC, 172 U.S.App.D.C. 54, 57, 520 F.2d 454, 457 (D.C. Cir. 1975).
 
 
 8
 FPL filed the transmissionschedules as initial rates. By reclassifying those schedules as changed rates, the Commission gained the power to suspend them, a suspension which, albeit for only one day, is unlawful if the Commission's classification is inappropriate. Moreover, by classifying the schedules as changed rates, the Commission placed upon FPL the burden of justifying the change, a burden imposed on the utility only by § 205(e)' § provisions for changed rates. The Commission argues that § 205(e)'s assignment of the burden of proof cannot yet aggrieve FPL because the utility bears the burden only if the change in rates is an increase. Not yet having determined whether the transmission schedule increases the rate for transmission from what it is under the interchange and requirements schedules, the Commission argues, it has not yet assigned any burden to FPL. We find this argument less than candid. The intervening cities of Homestead and Lake Worth complain, among other things, that FPL charges a higher price for transmitting under the separate transmission agreements than under the interchange and requirements agreements. It appears quite likely, then, that the burden of proof at the hearings will fall on FPL. Again, the Commission could not impose this burden on FPL but for the classification of the transmission schedules as changed rates. Finally, FPL faces the possibility that it will have to refund some or all of the increase in rates, and all four rates have now been in effect for over a year. This is another possibility FPL faces solely because of the Commission's classification. If the rates had been classified as initial rates, any change ordered by the Commission would be prospective only; no refund could be required. In these circumstances, we find that FPL is sufficiently "aggrieved" by the Commission's orders to meet the requirement of § 313(b).
 
 III.
 
 9
 The Federal Power Act does not define initial or changed rates, and it is therefore properly the Commission's task, using its technical expertise, to draw the line between them. The courts must defer to the Commission's judgment unless the line it draws cannot be rationally reconciled with the terms of the Act. Otter Tail Power Company v. FERC, supra, at 404. The Commission has expressed its judgment in § 35.1 of its regulations. 18 C.F.R. § 35.1. That section reads:
 
 
 10
 (b) A rate schedule applicable to a transmission or sale of electric energy, other than that which proposes to supersede, supplement, cancel or otherwise change the provisions of a rate schedule required to be on file with the Commission shall be filed as an initial rate. . . .
 
 
 11
 (c) A rate schedule applicable to a transmission or sale of electric energy which proposes to supersede, supplement, cancel or otherwise change any of the provisions of a rate schedule required to be on file with the Commission (such as providing for other or additional rates, charges, classifications or services or rules, regulations, practices or contracts for a particular customer or customers) shall be filed as a change in rate. . . .
 
 
 12
 The Commission asserts that the schedules FPL filed for its transmission agreements with TECO and the three cities "supersede, supplement, cancel or otherwise change" the transmission rate that is necessarily included in the schedules already on file for the interchange and requirements agreements between FPL and those customers. FPL advances several arguments why that theory cannot be rationally reconciled with the terms of the Act, but we do not find them persuasive.
 
 
 13
 [199 U.S.App.D.C. 233] FPL argues first that the Commission deviated from the statutory framework in classifying the transmission agreement schedules as changed rates because those schedules do not, as § 205(d) requires, "stat(e) plainly the change or changes to be made in the schedule or schedules then in force." Indeed, they cannot do so, FPL asserts, because there is no transmission agreement schedule in force from which these filed schedules change. This argument begs the question before us, for it assumes that the Commission's judgment that transmission as a distinct service is the same service as transmission necessary to interchange or requirements service is wrong. FPL does not assert that, if it accepted the Commission's judgment, it could not state plainly the change in transmission rate. Moreover, the FPL argument, if accepted, would imply that a utility company can secure for itself the benefits of an initial rate simply by how it drafts its filing, irrespective of the Commission's view of the matter in the exercise of its technical expertise. The Act cannot be read to countenance that result.
 
 
 14
 FPL argues next that the Commission cannot assert that transmission qua transmission is the same service as transmission necessary to interchange or requirements, and therefore cannot classify the transmission agreement schedules as changed rates, because several provisions of the Act distinguish transmission from sale (which includes both interchange and partial requirements) as fundamentally different services. For example, FPL notes that § 205(c) refers to "schedules showing all rates and charges for any transmission or sale" (emphasis added by FPL). From that and similar references in other sections, FPL concludes that "the statute recognizes two distinct and different activities of a public utility and requires that schedules be filed for the rates and charges associated with each." Brief for Petitioner, at 22 (emphasis original). FPL reads too much into the Act. The plurality of "schedules" need not refer to different services; it could as sensibly refer to different schedules for different customers.
 
 
 15
 Finally, FPL asserts the argument that underlies its others and is the crux of its complaint: that, as a factual matter, the transmission agreement provides for a fundamentally different service than do either the interchange or requirements agreements because it lacks the broad purpose of ensuring reliability and economy that underlies the interchange agreements and lacks the supplier-customer relationship that underlies the requirements agreement and that, therefore, the Commission cannot reasonably classify the transmission agreement schedules as changed rates from the interchange and requirements agreements schedules, even though those services necessarily include transmission. This is precisely the type of question we must leave to the technical expertise of the Commission; we will not substitute our judgment unless the Commission's judgment is unreasonable and cannot be rationally reconciled with the terms of the Act. Otter Tail Power Company v. FERC, supra, at 407. We find it reasonable for the Commission to decide that transmission as a distinct service is the same kind of service as transmission necessary to an interchange or requirements service. We also find the Commission's judgment rationally reconcilable with the terms of the Act. Section 205(d) states that "no change shall be made by a public utility in any such rate," "such rate(s)" being those shown in the schedules which, according to § 205(c), "every public utility shall file . . . for any transmission or sale." The Commission's theory that FPL, by filing a rate schedule for transmission under the transmission agreements different from the schedules for transmission under the interchange and requirements agreements, has made a change in a rate for transmission service shown in a schedule on file is not inconsistent with the language of the statute.
 
 IV.
 
 16
 In addition to arguing that the Commission's classification of the transmission agreement schedule as a changed rate cannot be rationally reconciled with the terms [199 U.S.App.D.C. 234] of the Act, FPL asserts another ground for overturning the Commission's classification: the classification deviates from past Commission classifications which courts have affirmed. The Commission does not dispute that its theory in this case is a relatively new one. Rather, it admits that this theory (which it first announced in an earlier order involving FPL, Florida Power & Light, Docket No. ER77-175) is not the same theory that, for example, underpinned an earlier decision in which it classified a transmission agreement that replaced a partial requirements agreement as an initial rate. See Otter Tail Power Company, 50 FPC 1341 (1973), affirmed (without addressing the question of classification) in Towns of Alexandria, Minnesota v. FPC, 181 U.S.App.D.C. 83, 555 F.2d 1020 (D.C. Cir. 1977). That the Commission has not followed its past decisions does not, however, necessarily invalidate its decision in this case. The Commission draws the line between initial and changed rates, and it may alter that line so long as it proceeds on a reasoned basis that is not clearly outside the statutory framework. Otter Tail Power v. FERC, supra, at 408 n. 37.
 
 
 17
 That the Commission chose to adopt this new policy in an adjudicative proceeding, rather than by rule-making, does not impair its authority to make the change or to apply the new policy to the parties in the pending adjudication. NLRB v. Bell Aerospace Co., 416 U.S. 267, 294, 94 S.Ct. 1757, 1771, 40 L.Ed.2d 134 (1974); Office of Communication of United Church of Christ v. FCC, 191 U.S.App.D.C. 360, 368, 590 F.2d 1062, 1070 (1978). The Commission's former interpretation of its regulations on this matter was not promulgated until 1973 in Otter Tail Power Co., 50 F.P.C. 1340 (1973), and was rather quickly reconsidered as the full ramifications of the policy began to emerge. See Cleveland Electric Illuminating Co., Docket No. ER78-194 (Sept. 5, 1978). The Commission has the power to reverse policies that experience has taught it were ill-advised, and this court has made it clear that such reversals can be effectuated in adjudicative proceedings as well as by rule-making. Chisholm v. FCC, 176 U.S.App.D.C. 1, 16-18, 538 F.2d 349, 346-66, cert. denied, 429 U.S. 890, 97 S.Ct. 247, 50 L.Ed.2d 173 (1976); New Castle County Airport Comm'n v. CAB, 125 U.S.App.D.C. 268, 270, 371 F.2d 733, 735 (1966), cert. denied sub nom. Board of Transp. v. CAB, 387 U.S. 930, 87 S.Ct. 2052, 18 L.Ed.2d 991 (1967).
 
 
 18
 We believe that the Commission has proceeded on a reasonable basis. One of the primary purposes of the Federal Power Act is to curb abusive activities by public utilities, Gulf States Utilities Co. v. FPC, 411 U.S. 747, 758, 93 S.Ct. 1870, 1877, 36 L.Ed.2d 635 (1973), and to protect consumers of electrical services from excessive rates, Town of Alexandria, Minnesota v. FPC, supra, 181 U.S.App.D.C. at 91, 555 F.2d at 1028. One of the abuses that the Commission is clearly authorized to combat in exercising its § 205 and § 206 powers is the use by a public utility of anticompetitive practices. Gulf States Utilities Co. v. FPL, supra, 411 U.S. at 758-59, 93 S.Ct. at 1877-78. The intervenors in this case, Homestead and Lake Worth, allege that FPL's efforts to file the transmission agreement schedules as initial rates is such an abuse. According to the intervenors, FPL is resisting the requests of municipally owned utilities for transmission services, a type of refusal to deal which the Supreme Court has found to violate the antitrust laws. Otter Tail Power Company v. United States, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973). The intervenors claim that FPL has discouraged attempts to obtain transmission services by insisting upon separate transmission agreements, which often involve protracted negotiation and litigation, rather than instituting a general transmission tariff that would apply to all transmission service, and by filing those agreements as initial rates, thereby creating the risk to utilities seeking transmission that even if the rate is eventually found to be excessive they will have paid the excess during the time consumed by lengthy hearings and litigation without the possibility of refund.
 
 
 19
 [199 U.S.App.D.C. 235] We pass no judgment upon these allegations. However, we believe that in light of the Commission's continuing duty to guard against abusive practices, it proceeds on a reasoned basis when it redraws its lines between initial and changed rates so as to scrutinize these transmission agreement schedules with its broader § 205(e) powers. We have already stated that the new line the Commission has drawn is rationally reconcilable with the terms of the statute. Finding as well that the Commission proceeded to redraw the line upon a reasoned basis which, far from being clearly outside the statutory framework, is clearly within it, we let stand the Commission's orders classifying the transmission agreement schedules as changed rates.
 
 V.
 
 20
 Finally, FPL argues that even if the Commission properly classified the schedules, we must vacate the order suspending for one day and then putting into effect, subject to refund, the schedule for the FPL-Vero Beach agreement and an amendment to the FPL-TECO agreement,[5] because the Commission failed to issue that order within the 30 days allowed for such action by § 205(d). The Commission does not dispute that FPL tendered the schedule and amendment for filing on August 21, 1978, nor that its order did not issue until 31 days later on September 21. On the other hand, FPL does not dispute that the Commission decided to suspend the schedule and amendment on September 20, the 30th day, at a public hearing which FPL's counsel attended, nor that the Commission instructed the Office of the Secretary to issue the order on that day.
 
 
 21
 In our opinion, these circumstances are not sufficient to require the vacation of the order. To be sure, the Commission itself has stated that it "acts officially only through its orders as issued by the Secretary." Public Service Company of New Mexico, Docket Nos. ER78-337 and ER78-338. Therefore, FPL argues, the Commission cannot now claim that it acted officially before the Secretary issued the order on the 31st day. But counsel for FPL have taken that statement out of context and given it a meaning the Commission did not intend it to have. In Public Service Company of New Mexico, the Commission was confronted by attempts of counsel present at its meetings to use commissioners' comments to circumvent the clear language of the Commission's public orders. Having just recently admitted the public to its meetings, the Commission did not want the privilege abused or its deliberations hamstrung by having every comment made in public subject to the close scrutiny of adversary counsel. To curtail such abuse, the Commission said, in effect: If you want to know what we meant to do, look to the formal order, not the comments made in the course of our deliberations. In context, then, the statement that "(t)he Commission acts officially only through its orders as issued by the Secretary," was intended to refer to the content of a Commission order, not its effective date.
 
 
 22
 There is no dispute in this case that the Commission intended to act within the 30-day limit and thought that it had. There is no question of prejudice to the petitioners, whose counsel were present at the meeting and who knew from three previous proceedings how the Commission would rule on its filing. In such circumstances, we hold that the Commission acted within the 30-day limit, even though the order expressing that action was, due to clerical oversight, published one day late.
 
 
 23
 The dissent construes this portion of the opinion as running contrary to the well-accepted principle that a court may not rely on post hoc rationalizations to sustain an administrative order. It is equally well-settled, however, that a court may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Bowman Transp., Inc. v. Arkansas-Best Freight Sys., 419 U.S. 281, 286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974). Here, the Commission's path was clear and appellant [199 U.S.App.D.C. 236] knew exactly where the Commission was going. Nor can we agree that a distinction that is crystal clear in one case should not be applied simply because there might be some other cases in which it would be more difficult to apply.
 
 
 24
 Petitions dismissed.
 
 
 25
 TAMM, Circuit Judge, concurring in part and dissenting in part:
 
 
 26
 I wholeheartedly concur in Judge LUMBARD's majority opinion insofar as it demonstrates, I think convincingly, that the Commission could properly classify the rates here in question as "changed" rates, rather than "initial" rates. Regretfully, however, I am compelled to dissent from the novel reasoning and result of the majority, see Majority Op. at --- - --- of 199 U.S.App.D.C., at 817-818 of 617 F.2d, on the question of whether the agency exceeded its authority by issuing one of the challenged orders after the statutory deadline for Commission action.
 
 
 27
 When, as here, a utility has requested that the effective date for a change in rates be no later than thirty days after the date of filing, it is undisputed that for the Commission to act under section 205(d)-(e) of the Federal Power Act, 16 U.S.C. § 824d(d)-(e) (1976) (amended 1978),[1] it must do so within this thirty-day period. See 18 C.F.R. § 2.4(a) (1979). At the end of the thirtieth day, the Commission, by operation of law, loses its power to take action pursuant to this section. Any action after that time is ultra vires and beyond the statutory authority granted by Congress.
 
 
 28
 Had the Commission issued an order within the prescribed period and desired thereafter to correct an inadvertent error contained in the order, the agency admittedly would have had the ability to rectify the "clerical error" that had been made. See American Trucking Associations v. Frisco Transportation Co., 358 U.S. 133, 144-46, 79 S.Ct. 170, 3 L.Ed.2d 172 (1958). This, however, is not such a case. Here, the majority extends the "clerical error" doctrine to justify the total failure to issue an order within the time period set by Congress as the limit for agency action. No case has been cited in support of this result.
 
 
 29
 If any administrative agency has the ability to "correct," as a "clerical error," the very fact that an order has not been issued, it surely is not the Federal Energy Regulatory Commission. The Commission not only clearly, but emphatically, has stated that it " 'acts officially only through its orders as issued by the Secretary.' " Public Service Co. of New Mexico, Docket Nos. ER78-337 & ER78-338, at 4-5 (FERC Aug. 28, 1978) (order granting and denying rehearing) (emphasis in original) (quoting High Island Offshore System, Docket Nos. CP75-104, CP75-81, & CP75-16, at 2 (FPC June 4, 1976) (order denying request for conference)). " 'Thus, the legal sufficiency of Commission action must, as in the past, be judged solely on the basis of the action itself and any official supporting statement released by the Commission not on the basis of remarks or observations made prior thereto.' " Id. at 5 n.13 (quoting Order Permitting Recording and Photographing of Open Commission Meetings, Docket No. RM78-13 (FERC May 9, 1978)).
 
 
 30
 An administrative agency must adhere to its own precedents unless, by a reasoned opinion, the agency justifies its determination not to follow the authorities in question. "It is an elementary tenet of administrative law that an agency must either conform to its own precedents or explain its departure from them." International Union, United Automobile, Aerospace & Agricultural Implement Workers of America (UAW) v. NLRB, 148 U.S.App.D.C. 305, 317, 459 F.2d 1329, 1341 (D.C. Cir. 1972). See K. Davis, Administrative Law of the Seventies § 17.07-4 (1976). Accordingly, even if this court could appropriately decide that agencies generally have the power to "correct" late orders in the fashion attempted here, we cannot do so with respect to [199 U.S.App.D.C. 237] this agency unless we find that the Commission has justified its decision not to follow the past precedents that are apparently controlling.
 
 
 31
 The majority makes an effort to avoid these past Commission precedents on the ground that there is a distinction between what the Commission says for which one looks only to the agency's order as issued by its secretary and when it says it for which one looks to when the Commission votes on the order, at least when the relevant counsel are present and there is no obvious prejudice. Although at first blush the distinction seems tenable, I fear that this is an unfortunate example of the infamous "distinction without a difference." The majority suggests that to know when the Commission has acted on a matter, it is permissible to examine the agency's proceedings prior to the issuance of an order through its secretary, but that the content of that action is determined solely by the order itself. To know when the Commission has acted, however, is meaningless unless we can tell what it did when it acted. Suppose, for example, that the Commission, within the statutory period, voted for an order containing items A and B. One day after the statutory deadline, an order issued containing not only A and B, but also C, an item that had not been previously voted on by the Commission. It would seem self-evident that the agency did not act on item C within the requisite time period, but the only way to determine this, and the only way the majority can say that the Commission acted here within the statutory period, is by doing just what the agency's precedent categorically precludes: examining the agency's pre-order proceedings to determine what the agency has done at any given time.[2]
 
 
 32
 Even if the majority's distinction were not so unrealistic, it would nonetheless be no more than a court-made "post hoc rationalization" for the Commission's failure to adhere to its prior precedents. It is too late in the day to dispute the fundamental proposition that courts cannot adopt " 'post hoc rationalizations for agency action'; for an agency's order must be upheld, if at all, 'on the same basis articulated in the order by the agency itself.' " FPC v. Texaco, Inc., 417 U.S. 380, 397, 94 S.Ct. 2315, 2326, 41 L.Ed.2d 141 (1974) (quoting Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168-69, 83 S.Ct. 239, 245-46, 9 L.Ed.2d 207 (1962)). See SEC v. Chenery Corp., 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947). Thus, it is the agency that must reconcile its decisions. Here, the Commission clearly was confronted by the apparent conflict with its past precedent. Indeed, two dissenting commissioners decried the agency's failure to follow this authority: "(The Commission majority's) rationale cannot be squared with the Commission's clear pronouncement in a recent order that the 'Commission acts officially only through its orders as issued by the Secretary.' " Florida Power & Light Co., Docket Nos. ER78-566, ER78-567, ER78-19, et al., at 5 (FERC Mar. 6, 1976) (order on rehearing denying relief requested by Florida Power & Light Co.) (Smith & Hall, Comm'rs, dissenting in part) (footnote omitted), reprinted in Joint Appendix at 131, 135. Nonetheless, the majority opinion of the Commission did not even address the apparent conflict with past precedent, let alone conceive a theory like that expounded now by my colleagues.[3] We cannot tolerate [199 U.S.App.D.C. 238] an agency's having thus "casually ignored" its prior policies and standards. See Greater Boston Television Corp. v. FCC, 143 U.S.App.D.C. 383, 394, 444 F.2d 841, 852 (D.C.Cir.) (Leventhal, J.), cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971).
 
 
 33
 As I perceive the majority's resolution of this issue, it effectively allows the Commission to straddle the administrative fence on the question of how the Commission takes official action. When it works to the agency's advantage, the Commission can proclaim in the strongest of terms that it acts only through its official orders as issued by its secretary. On the other hand, when a contrary result is more appealing, the Commission can save the day in the name of the "clerical error" doctrine. This inconsistency cannot be squared with the elementary requirement of reasoned agency decision-making.
 
 
 34
 "(A)dministrative actions taken in violation of statutory authorization or requirement are of no effect," City of Santa Clara v. Andrus, 572 F.2d 660, 677 (9th Cir.), cert. denied, 439 U.S. 859, 99 S.Ct. 176, 58 L.Ed.2d 167 (1978), and the absence of prejudice or hardship does not give us a license to extend the power of administrative agencies by judicial fiat. I would find the order to be untimely and beyond the power of the Commission.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. § 294(d) (1976)
 
 
 [1]
 FERC Docket No. ER78-325 (No. 78-1884 in this court): Order Accepting Rate Schedule for Filing, Providing for Hearing, Waiving Regulations, Granting Intervention, and Consolidating Proceedings, issued May 19, 1978. FERC Docket No. ER78-478 (No. 78-2249 in this court): Order Accepting Rate Schedule for Filing, Providing for Suspension, Providing for Hearing, Waiving Regulations, Granting Intervention, and Consolidating Proceedings, issued August 9, 1978. FERC Docket No. ER78-508 (No. 79-2302 in this court): Order Accepting for Filing and Suspending Proposed Transmission Service Agreement, Waiving Filing Requirements, and Consolidating Proceedings, issued August 23, 1978. FERC Docket No. ER78-566 (No. 79-1260 in this court): Order Accepting Rate Schedules for Filing, Providing for Suspension and Hearing, Waiving Regulations, and Consolidating Proceedings, issued September 21, 1978; and Order on Rehearing Denying Relief Requested by Florida Power & Light Company, issued March 6, 1979
 
 
 [2]
 The Commission disagrees with this reading of the Act. According to the Commission, the phrase "any such new schedule" in § 205(e) does not necessarily refer to § 205(d)'s "new schedules stating plainly the change or changes to be made in the schedule or schedules then in force." Rather, the Commission suggests, § 205(e)'s "any such new schedule" can as easily be read to refer to § 205(c)'s mandate that utilities file "schedules showing all rates and charges for any transmission or sale." We disagree. As a matter of commonsensical construction, "any such new schedule" in § 205(e) refers to the immediately preceding "new schedules" in § 205(d) rather than to the more general and more distant "schedules" in § 205(c). This construction is supported by the Supreme Court's construction of almost identical sections in the Natural Gas Act. United Gas Pipe Line Co. v. Mobile Gas Service Corp., 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956). Moreover, the Commission fails to make clear the significance of the conclusion it draws from its reading: that when § 205(e) is read in conjunction with § 205(c), "no statutory implication of initial rate treatment of rate schedule filings for allegedly new and different services arises." Brief for Respondent, at 22. Whatever the merit of that conclusion, the Commission's argument before us is that the services for which FPL filed the schedules in question are not new or different services, see part III infra, and we address only that issue
 L is a public utility subject to the Federal Power Act. It sells electricity at retail to 1.8 million customers and at wholesale to seven cooperatives and four municipalities. In addition, it has agreements with other electric utilities to exchange electricity in order to enhance its and the other utilities' reliability and to facilitate maintenance and economic power production. FPL has such agreements known as interchange agreements with, among others, the Tampa Electric Company (TECO) and the utility authorities of the cities of Homestead, Lake Worth, and Vero Beach, Florida.
 
 
 [3]
 Homestead, between October 11, 1977 and April 21, 1978, entered into interchange agreements with Orlando Utilities Commission, Florida Power Company, TECO, Fort Pierce Utilities Authority, and the Utility Commission of the City of New Smyrna Beach
 Lake Worth, between August 9, 1977 and May 8, 1978, entered into interchange agreements with Orlando Utilities Commission, Florida Power Company, Fort Pierce Utilities Authority, and Utility Commission of the City of New Smyrna Beach, and Homestead.
 TECO, between February 6, 1978 and May 15, 1978, entered into interchange agreements with Orlando Utilities Commission, Homestead, and Lake Worth.
 Vero Beach, between June 6, 1978 and July 10, 1978, entered into interchange agreements with Orlando Utilities Commission, Florida Power Company, and TECO.
 
 
 [4]
 FPL and Homestead negotiated a transmission agreement, but Homestead refused to sign it. FPL filed it nonetheless on April 30, 1978, because Homestead wished not to delay implementing its interchange agreements. FPL filed its similarly negotiated but unexecuted agreement with Lake Worth on July 10, 1978. The agreement with TECO, filed on July 25, 1978, and the agreement with Vero Beach, filed on August 21, 1978, were both fully executed
 
 
 [5]
 FERC Docket No. ER78-566 (No. 79-1260 in this court)
 
 
 [1]
 The 1978 amendment to this section, not applicable in this case, increased the thirty-day period to sixty days. See Public Utility Regulatory Policies Act of 1978, Pub.L.No.95-617, tit. II, § 207(a), 92 Stat. 3117
 
 
 [2]
 The Commission in this case admitted making what it called "minor editorial revisions" after the order was voted on but before it issued. Florida Power & Light Co., Docket Nos. ER78-566, ER78-567, ER78-19, et al., at 3 (FERC Mar. 6, 1979) (order on rehearing denying relief requested by Florida Power & Light Co.), reprinted in Joint Appendix at 131, 133. I assume that if the revisions had not been "minor," the majority might reach a different result, but how are we to know whether the revisions were "minor" or "major" without examining the content of the Commission's action prior to the issuance of its order?
 
 
 [3]
 In the final paragraph of its opinion, the majority of this court cites Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974), for the indisputably accurate proposition that a court may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." See Majority Op. --- of 199, at 817 of 617 F.2d. Frankly, the relevance of this statement here simply eludes me, for the Commission said absolutely nothing concerning how its decision might be reconciled with its prior pronouncements, and therefore this court has absolutely nothing from which to "reasonably discern" any analysis that the Commission might have advanced. To divine an agency's reasoning when none at all is presented "propel(s) the court into the domain which Congress has set aside exclusively for the administrative agency." SEC v. Chenery Corp., 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947)